

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 3, 2021**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **ESSENTIAL FINANCIAL** | § | **Case No. 18-33108** |
| **EDUCATION, INC.** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| **DANIEL SHERMAN, CHAPTER 7** | § | |
| **TRUSTEE,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adv. Pro. No. 20-3092** |
| | § | |
| **OTA FRANCHISE** | § | |
| **CORPORATION,** | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER REGARDING
### CROSS-MOTIONS FOR SUMMARY JUDGMENT OF
### THE TRUSTEE AND OTA FRANCHISE CORPORATION

1

Before this Court are cross-motions for summary judgment: 1) the Motion for Partial Summary Judgment (the "**Trustee Motion**") and Brief in Support (the "**Trustee Brief**"),[1] filed by Daniel Sherman, the duly appointed Chapter 7 Trustee (the "**Trustee**") for the bankruptcy estate of Essential Financial Education, Inc. (the "**Debtor**" or "**Essential**"); and 2) the Motion for Partial Summary Judgment (the "**OTAF Motion**") and Brief in Support (the "**OTAF Brief**")[2] filed by OTA Franchise Corporation ("**OTAF**" or the "**Defendant**"). The Court will refer to the Trustee Motion, the Trustee Brief, the OTAF Motion, and the OTAF Brief collectively as the "**Summary Judgment Motions**." In the Trustee Motion, the Trustee requests summary judgment on the first four causes of action contained in his Original Adversary Complaint to Avoid and Recover Transfers (the "**Complaint**").[3] Two of these counts deal with actual and constructive fraudulent transfers under § 548(a)(1) of the Bankruptcy Code,[4] and the remaining causes of action are for actual and constructive fraudulent transfers brought pursuant to § 544(b) of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"), which is codified in Chapter 24 of the Texas Business and Commerce Code. The Trustee also requests summary judgment on many of the affirmative defenses OTAF asserted in its Answer (the "**Answer**").[5] OTAF, in turn, requests summary judgment on the Trustee's TUFTA causes of action, and the Trustee's fifth cause of action for avoidance of preferential transfers, where the Trustee claims that certain transfers made to OTAF are avoidable preferences. For the reasons that follow, the Court will grant in part and deny in part the Trustee Motion and will deny the OTAF Motion.

---

[1] ECF Nos. 50 and 56, respectively.

[2] ECF Nos. 47 and 48, respectively.

[3] ECF No. 1. As will be discussed further below, in the Trustee Motion, the Trustee purports to seek summary judgment only as to the first three counts in the Complaint. ECF No. 50 ¶ 1. In the Trustee Brief and at oral argument, however, the Trustee argued for summary judgment as to the first *four* counts in the Complaint. ECF No. 56 ¶¶ 1, 84. OTAF did not address this inconsistency in its briefing or argument. As such, the Court will construe the Trustee Motion as seeking summary judgment on the first four counts in the Complaint, consistent with the Trustee Brief.

[4] 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**").

[5] ECF No. 8.

## I.     Jurisdiction and Venue.

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C.

§ 1334. This is a core proceeding under 28 U.S.C. § 157(b).  The bankruptcy court has authority

to adjudicate this matter pursuant to the United States District Court for the Northern District of

Texas Miscellaneous Order No. 33.  Both parties have consented to this Court hearing this matter

and determining the issues on a final basis.  The following shall constitute this Court's reasoning

pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable in adversary

proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

## II.     Undisputed Facts[6] and Procedural Posture.

OTAF is a Nevada corporation that licenses independent trading and financial education

centers that utilize OTAF's proprietary systems to offer their clients "efficient and cost-effective

trading education solutions."[7]  OTAF operates under a franchise model in which it licenses its

intellectual property to various entities across the United States who operate "Online Trading

Academy Centers" in exchange for royalties and other fees paid to OTAF.

In 2011, OTAF entered into a franchise agreement (the "**2011 Agreement**") with Thomas

Caufield ("**Caufield**"), under which OTAF granted Caufield a license to operate an Online Trading

Academy Center in the Dallas area (the "**Dallas Center**") in exchange for an initial franchise fee

of approximately $1.3 million (the "**Franchise Fee**").[8]  The 2011 Agreement provided that

---

[6] Even after the Court allowed the parties to submit itemized lists of assertedly undisputed facts post-hearing, the parties struggled to articulate, much less agree upon, what constituted an undisputed fact in this case.  ECF Nos. 101, 102, 104 and 107.  After careful review of the parties' assertions, responses, and citations to the record, the following will constitute the Court's findings as to the material, undisputed facts for purposes of the Summary Judgment Motions.

[7] ECF No. 49 at 15 (the "**OTAF App.**" at 18).

[8] ECF No. 55 at 27 (together with ECF No. 54, the "**Trustee App.**" at 0526).

Caufield would also pay a royalty fee equal to the greater of $2 million or 10% of the gross revenues of the Dallas Center,[9] as well as a bevy of other fees.[10]

Caufield raised the money to pay the Franchise Fee through a purported private placement offering by OTA Holdings, LLC, a Wisconsin limited liability company Caufield owned and operated.[11]   Through this private placement, Caufield raised between $600,000.00 and $750,000.00.[12]

By April of 2015, Caufield had fallen behind on approximately $200,000.00 in delinquent royalty fees due to OTAF under the 2011 Agreement.[13]  To remedy this situation, Caufield sought an additional investor in the Dallas Center.  Caufield found such an investor in Michael Ludlow ("**Ludlow**"), with whom he formed Essential.  Ludlow invested $600,000.00 in exchange for a 33% ownership interest in Essential.  Thereafter, Essential, through Caufield and Ludlow, began negotiating with OTAF to transfer Caufield's franchise license to Essential.  OTAF eventually agreed to grant Essential a franchise license in exchange for a payment of approximately $500,000.00.[14]  On October 20, 2015, Essential and OTAF executed a new franchise agreement (the "**2015 Agreement**") under which Essential would run the Dallas Center.[15]

Pursuant to the 2015 Agreement, OTAF retained the right to (i) access and inspect Essential's premises, (ii) interview its personnel and customers, and (iii) access its financial data, including its bank information and Essential's QuickBooks accounting data.[16]  OTAF also retained

---

[9] The flat minimum royalty fee was scheduled to increase every year to a cap of $5 million minimum royalties by the Dallas Center's third year of operation.  OTAF App. at 25.
[10] OTAF App. at 25–27.
[11] Trustee App. at 0526.
[12] *Id.*
[13] *Id.* at 0563.
[14] *Id.* at 0572.
[15] *Id.* at 0111.
[16] *See generally* OTAF App. at 86–138 (encompassing the 2015 Agreement).

the right to demand copies of tax returns.[17]  The 2015 Agreement also contained a section entitled "Grant of Security Interest," in which OTAF purported to take a security interest in "all proceeds of [Essential's] Online Trading Academy Center and in all of the assets, including equipment, furniture, fixtures, and signs used by, at or in connection with, your Online Trading Academy Center and its related business."[18]  OTAF did not file a UCC-1 financing statement related to this purported security agreement.[19]

Part of OTAF's business model included a mechanism for franchisees to contract with Universal Guardian Acceptance, LLC ("**UGA**") to provide factoring services to support or provide cash flows to franchisees.[20]  UGA's factoring services involved purchasing student contracts from franchisees in exchange for the collection rights on those contracts.[21]  Essential entered into such a factoring agreement with UGA on November 4, 2015 (the "**UGA Agreement**").[22]  Essential, pursuant to a similar mechanism, also entered into an agreement with Universal Account Servicing, LLC ("**UAS**"), UGA's affiliate, under which UAS provided collection services for student contracts Essential did not factor (the "**UAS Agreement**").[23]

Only one year after entering into the 2015 Agreement, Essential found itself having financial difficulties when it began bouncing payments for payroll tax liabilities to the IRS.[24]  Furthermore, in February of 2016, Caufield began circulating a "Private Placement Memorandum" in which Tuition Funding Source, LLC ("**TFS**"), a separate legal entity that Caufield wholly

---

[17] *See generally id.* at 86–138.
[18] *Id.* at 115.
[19] Trustee App. at 0592; ECF No. 73 ¶ 22.
[20] ECF No. 75-1 at 4 (the "**Trustee Sealed Resp. App.**" at 0004).
[21] Trustee App. at 0687–88.
[22] Case No. 18-33108 (hereinafter the "**Main Case**"), ECF No. 133 ¶ 8.  Caufield entered into the factoring agreement with UGA in his individual capacity prior to the formation of, and transfer of the franchise to, Essential.  *Id.*  Essential was made a party to the factoring agreement by novation.
[23] *Id.* ¶ 9.  As with the factoring agreement, Caufield entered into the servicing agreement individually and Essential was later substituted by a novation executed on November 4, 2015.
[24] Trustee App. at 0579.

5

owned and managed, purported to offer a series of promissory notes in the principal amount of $50,000 plus interest at an annualized rate of return of 17.9% with a repayment period of up to 15 months.[25] Through this offering, TFS obtained funds from individuals, including several students of Essential (the "**Student Lenders**").

Thereafter, in 2017, Caufield was served with a subpoena from the Securities and Exchange Commission (the "**SEC Subpoena**") related to an investigation into his personal affairs, including his relationships with the Student Lenders.[26] Caufield notified Gene Longobardi ("**Longobardi**"), OTAF's Chief Operating Officer, of the pending SEC investigation on November 24, 2017. Shortly thereafter, on December 4, 2017, OTAF delivered to Essential two letters, each with the subject line, "Notice of Defaults and Required Actions" (the "**Incurable Breach Notice**," the "**Past Due Notice**, and, collectively, the "**Breach Notices**").[27] In the Incurable Breach Notice, OTAF informed Essential that it had received the SEC subpoena and that Essential had committed several "incurable breaches" of the 2015 Agreement, including engaging in "misconduct that unfavorably affect[ed] OTAF's reputation" and committing "act[s] or omission[s] of fraud or misrepresentation."[28] OTAF further provided in the Incurable Breach Notice that, "effective immediately":

1. Tom Caufield is no longer a person qualified to be the "General Manager" as defined in the [2015 Agreement]. Mike Ludlow and Sean Manning have both qualified to operate in the capacity as General Manager.
2. Tom Caufield must immediately take steps to transition out of all operations of the franchised business and by December 22 may not be involved in the operations of the [franchised] business in any capacity.

---

[25] ECF No. 76 at 52 (the "**OTAF Resp. App.**" at 561).

[26] ECF No. 104 ¶ 17 (noting that it is undisputed that Essential was not the target of the SEC's investigation).

[27] Trustee App. at 0413–15 (the Incurable Breach Notice), 0420–22 (the Past Due Notice).

[28] *Id.* at 0413–14. OTAF alleged that Essential had breached Section 8.3 (Operation of the Franchised Business in accordance with the Manuals), Section 11.1(F) (engaging in conduct that unfavorably affects OTAF's reputation), and Section 11.1(J) (committing any act or omission of fraud or misrepresentation).

3. Tom Caufield may have access to records of the franchised business solely for the purposes of responding to the [SEC Subpoena].[29]

Finally, OTAF demanded that "all possible actions (including the payment of money) must be taken to put right any harms caused to any individuals who are customers of Online Trading Academy."[30]

In the Past Due Notice, OTAF notified Essential that it was delinquent $101,467.62, comprised of various invoices provided in an attached account statement.[31]   OTAF noted that failure to pay such amounts when due constituted a breach of the 2015 Agreement if the delinquency was not cured within 10 days from the date of the Past Due Notice.[32]   Finally, OTAF required Essential to provide a "current operating credit card" for future purchases from OTAF and "current banking information for ACH payments," each of which was required pursuant to the 2015 Agreement.[33]

The months following the Breach Notices saw the rapid devolution of Essential's financial existence.  Nevertheless, Essential managed to wipe out the delinquent amounts owed to OTAF by January 30, 2018.[34]   TFS, however, failed to maintain regular payments to the Student Lenders during this period.[35]   Furthermore, beginning in April 2018, UGA and UAS began withholding funds due to Essential under the respective factoring and collection agreements.[36]

Caufield began searching for a buyer to whom to sell Essential's assets sometime in November of 2017.[37]   In January 2018, Essential entered into a letter of intent with Ahsan Raza

---

[29] *Id.* at 0414.  The Incurable Breach Notice also noted that "[Caufield] no longer qualifies to own an Online Trading Academy franchised business, [Ludlow] does."  *Id.* at 0415.
[30] *Id.* at 0415.
[31] *Id.* at 0420, 0422.
[32] *Id.* at 0420.
[33] *Id.* at 0421.
[34] *Id.* at 0310 (showing Essential's "running balance" as ($0.00) on January 30, 2018).
[35] *Id.* at 0520.
[36] ECF No. 78-1 at 9 (the **"OTAF Sealed App."** at 6).
[37] OTAF App. at 672 (excerpt from deposition of Thomas Caufield, December 8, 2020, at 422:11–19).

("**Raza**"), who then formed Paramount Strategies, Inc., for the purpose of purchasing Essential's assets.[38]   The 2015 Agreement, however, provided that Essential obtain OTAF's consent to transfer the franchise.[39]   Thus, OTAF began to apply pressure to Essential and assert control over the sale process after Paramount signed the letter of intent, as described hereafter.   On February 28, 2018, OTAF delivered correspondence to Essential, noting the executed letter of intent and providing that OTAF would nevertheless terminate the franchise license unless: (1) Essential provided its feedback on a draft asset purchase agreement by March 1, 2018, (2) Essential and Paramount executed the ASA, subject to OTAF's approval, by March 5, 2018, and (3) Essential paid all amounts due to OTAF by March 5, 2018.[40]

Essential and Paramount failed to consummate the sale by OTAF's March 5, 2018 deadline.   Nevertheless, in correspondence dated March 19, 2018, OTAF noted Essential's "good faith willingness to pursue" the asset sale.[41]   OTAF did not let up its pressure on Essential, however, and provided a list of five additional conditions of its continued forbearance on terminating the franchise license.[42]   In correspondence dated March 23, 2018, OTAF moved the "finish line" and detailed several more conditions to its consent to the sale of Essential's assets.[43] These four conditions included requiring that the forthcoming asset purchase agreement provide for specific payouts to OTAF and the Student Lenders before any payout to Essential or Caufield.[44] The third numbered condition stated that "the terms of the Asset Purchase Agreement shall designate the distribution of the Sale Price . . . as follows."[45]   Payouts to OTAF for all sums due

---

[38] *Id.* (excerpt from deposition of Thomas Caufield, December 8, 2020, at 422:20–24); ECF No. 52 at 32 (the "**Trustee Sealed App.**" at 0032).
[39] Trustee App. at 0137, 0139–40.
[40] Trustee Sealed App. at 0032.
[41] *Id.* at 0039.
[42] *Id.* at 0040.
[43] *Id.* at 0027–28.
[44] *Id.* at 0027–28.
[45] *Id.* at 0028.

to it under the 2015 Agreement, a $115,000.00 transfer fee (the "**Transfer Fee**") and a $15,000.00 transition assistance fee (the "**Transition Fee**") were all required by direct wire transfer.[46] From the "remaining funds," the Student Lenders were to be paid first and the balance of the funds were to be disbursed in accordance with escrow instructions approved by OTAF.[47]

As the sale process dragged on, more Student Lenders began to contact OTAF directly regarding TFS' failure to maintain current payments to them.[48] In correspondence sent to Caufield and Ludlow dated April 2, 2018, OTAF noted that it was receiving inquiries from students and that, despite prior requests for a full listing of all Student Lenders, Caufield had not fully disclosed all students from whom TFS borrowed money.[49] Thus, OTAF demanded a full list of the Student Lenders "signed by [Caufield] under penalty of perjury."[50] On April 3, 2018, Caufield responded, purporting to provide a full list of the Student Lenders.[51] On April 10, 2018, however, OTAF delivered further correspondence, expressing doubt as to Caufield's completeness after receiving an inquiry from another undisclosed Student Lender.[52]

The Asset Purchase Agreement (the "**ASA**") was executed on April 30, 2018.[53] On June 21, 2018, Essential, Paramount, and OTAF entered into the Consent to Transfer.[54] The Consent to Transfer laid out eleven conditions precedent to OTAF's consent to the transfer of the license from Essential to Paramount.[55] The most notable of the conditions were: (i) the requirement of delivery of the ASA in a form acceptable to OTAF, (ii) the execution of escrow instructions in a

---

[46] *Id.* at 0028.
[47] *Id.*
[48] *Id.* at 0045.
[49] *Id.*
[50] *Id.*
[51] *Id.* at 0048.
[52] *Id.*
[53] Trustee App. at 0065.
[54] *Id.* at 0092.
[55] *Id.* at 0093–94.

form approved by OTAF, (iii) "required payments to the existing employees . . . [,] [S]tudent [L]enders and investors," (iv) the payment of the Transfer Fee and Transition Fee to OTAF, and (v) the payment of all sums due and payable under the 2015 Agreement to OTAF.[56]

Separately, OTAF discussed settlements with the Student Lenders directly.[57] OTAF's counsel thereafter drafted settlement agreements for execution by the Student Lenders in connection with the sale of Essential's assets.[58] Thirteen Student Lenders entered into settlement agreements pursuant to which they would receive funds from the Asset Sale (as hereinafter defined).[59] OTAF was listed as a released party in the settlement agreements along with Caufield, TFS, and Ludlow.[60]

Similarly, OTAF negotiated with UGA and UAS for the deposit of funds withheld from Essential into an escrow account to be used for the distribution of the sale proceeds.[61] In June of 2018, Essential entered into a Memorandum of Understanding (the "**MOU**") with UGA and UAS pursuant to which UGA and UAS agreed to deposit $127,427.27 and $22,257.00, respectively, into the forthcoming escrow account.[62]

---

[56] *Id.* (Sections 2.1.1, 2.1.2, 2.1.8, 2.1.10).

[57] *Id.* at 0708.

[58] *Id.* at 0722.

[59] *Id.* at 0723; 0056–58 (listing thirteen "Online Trading Academy Student Settlements").

[60] *Id.* at 0035. Longobardi testified in his deposition that, after reviewing the settlement agreement executed by Dr. Cecil Bailey, the other settlement agreements with the remaining Student Lenders were in substantially the same form. *Id.* at 0723.

[61] *Id.* at 0514 (Caufield testifying that the negotiations as to UGA's and UAS' deposit into the escrow account were done "behind [his] back.").

[62] ECF No. 104 ¶ 64. OTAF disputes that it was involved with respect to memorializing the agreement to deposit the withheld funds, as OTAF was not a party to the MOU. *Id.* ¶ 63. As an initial matter, the MOU is only before the Court as part of an appendix filed by OTAF almost two weeks after the hearing on the motions, without leave of Court, and despite the Court's explicit instruction that no supplements to the record were permitted. Even if leave had been sought and granted, the MOU reflects only Ludlow's signature and is otherwise undated. Finally, the mere fact that OTAF had the forethought to leave itself out of the terms of the MOU is insufficient to rebut Caufield's testimony that the *negotiation* of the MOU took place without his or Essential's input. Thus, this fact is not genuinely disputed.

On June 27, 2018, Essential, Paramount, and OTAF entered into an escrow agreement (the "**Escrow Agreement**") with UMB Bank, N.A. ("**UMB**") acting as escrow agent.[63]  Pursuant to the Escrow Agreement, Paramount would deposit the purchase price of $2.145 million into an escrow account with UMB (the "**UMB Escrow**") simultaneously with the execution and delivery of the Escrow Agreement.[64]  Schedule 1 to the Escrow Agreement laid out the payments to be made from the UMB Escrow.[65]  First, UMB was to distribute funds totaling $79,512.00 to certain of Essential's employees.[66]  Second, UMB was to distribute funds totaling approximately $1.3 million pursuant to the terms of the Student Lenders' settlement agreements.[67]  Third, UMB was to distribute $859,216.00 to OTAF for amounts allegedly due to it from Essential pursuant to the 2015 Agreement.[68]  Fourth, UMB was to distribute funds totaling $16,003.33 to certain of Essential's vendors.[69]  The residual funds remaining after all other distributions were to be distributed to Essential.[70]

On July 2, 2018, Paramount deposited $2.14 million into the UMB Escrow as payment for the purchase of Essential's assets (the "**Asset Sale**").[71]  The funds from the UMB Escrow were distributed in accordance with the Escrow Agreement beginning on July 2, 2018.[72]  On July 3, 2018, OTAF received a distribution from the UMB Escrow of $859,216.00 (the "**Escrow**

---

[63] Trustee App. at 0043.
[64] *Id.*
[65] *Id.* at 0055–60.
[66] *Id.* at 0055–56.
[67] *Id.* at 0056–59.
[68] *Id.* at 0059.
[69] *Id.* at 0059–60.
[70] *Id.* at 0060.
[71] Trustee Sealed App. at 0054.
[72] *Id.*

Transfer").[73]  On July 18, 2018, after all other distributions had been made, Essential received a residual distribution of $1,662.81 from the UMB Escrow.[74]

As the escrow disbursements began, Gary Flick ("**Flick**") filed a complaint against Caufield, Essential, and TFS alleging violations of federal and state securities laws (the "**Flick Matter**").[75]  Caufield and Flick entered into a settlement agreement (the "**Flick Settlement**") on September 20, 2018.[76]

Five days later, on September 25, 2018, Flick filed a Chapter 7 Involuntary Petition against Essential, initiating the Main Case.[77]  OTAF wasted no time in participating in the Main Case. Flick filed a Motion for Relief from the Automatic Stay on October 22, 2018.[78]  OTAF filed its objection thereto on November 5, 2018, contemporaneously with its Motion for Dismissal or Abstention, therein requesting that the Court dismiss the involuntary petition or abstain from ruling thereon.[79]  On November 15, 2018, the Court entered the Order for Relief.[80]

The Court denied OTAF's Motion for Dismissal or Abstention by memorandum opinion entered on April 16, 2019.[81]  OTAF timely appealed the Court's memorandum opinion on April 30, 2019.[82]  The District Court for the Northern District of Texas dismissed OTAF's appeal on July 3, 2019.[83]

---

[73] *Id.* at 0055; ECF No. 104 ¶ 33.
[74] Trustee Sealed App. at 0057.
[75] Complaint, Flick v. Caufield, et al., No. 3:18-cv-1734 (N.D. Tex. July 2, 2018), ECF No. 1.
[76] Main Case, Claim No. 9-1 at 5–16.
[77] Main Case, ECF No. 1.
[78] Main Case, ECF No. 7.
[79] ECF Nos. 9–10
[80] Main Case, ECF No. 14.
[81] Main Case, ECF No. 69.  Judge Dodd entered the Order Denying OTAF's Motion for Dismissal or Abstention on April 30, 2019.  ECF No. 71.
[82] Main Case, ECF No. 70, amended on May 1, 2019, ECF No. 73.
[83] Mem. Op. and Order, OTA Franchise Corporation v. Flick, Case No. 3:19-cv-01125-L (N.D. Tex. July 3, 2019), ECF No. 7; *see* Main Case, ECF No. 90.

On July 29, 2020, the Trustee filed his Complaint, commencing this adversary proceeding.[84] The Trustee asserted six causes of action in the Complaint.[85] On August 26, 2020, OTAF timely filed its Answer in which it asserted twenty-six affirmative defenses and no counterclaims.[86] On December 28, 2020, OTAF filed the OTAF Motion and the OTAF Brief.[87] In the OTAF Motion, OTAF seeks summary judgment in its favor on the Trustee's first, fourth, and fifth causes of action.[88] On the same day, the Trustee filed the Trustee Motion and the Trustee Brief.[89] On January 11, 2021, each party filed its respective response (the "**OTAF Response**" and the "**Trustee Response**," respectively).[90]

On January 21 and 22, 2021, the Court heard lengthy oral argument on the Summary Judgment Motions. The Court allowed each party to file a list of undisputed facts post-hearing.[91] The Parties were also permitted to respond to each statement of undisputed facts.[92] The Parties each filed a Statement of Undisputed Facts on January 29, 2021 (the "**Trustee Undisputed Facts**"

---

[84] ECF No. 1.

[85] ECF No. 1 ¶¶ 41–57. The Trustee asserted causes of action for: (1) avoidance of actual fraudulent transfers pursuant to 11 U.S.C. § 544(b) and TUFTA § 24.005(a)(1); (2) avoidance of actual fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A); (3) avoidance of constructive fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B); (4) avoidance of constructive fraudulent transfers pursuant to 11 U.S.C. § 544(b) and TUFTA § 24.006; (5) avoidance of preferences pursuant to 11 U.S.C. § 547(b); and (6) disallowance pursuant to 11 U.S.C. § 502(b).

[86] ECF No. 8.

[87] ECF Nos. 47, 48. OTAF filed its Appendix in Support of the OTAF Brief on the same day. ECF No. 49.

[88] ECF No. 47 at 2.

[89] ECF Nos. 50, 56. The Trustee filed the Appendix in Support of the Trustee Brief on December 29, 2020. ECF Nos. 54, 55. The Trustee also filed a Motion to File Document Under Seal, with an attached confidential appendix on December 29, 2020. ECF No. 52. On December 30, 2020, the Court granted the Trustee's Motion to File Document Under Seal. ECF No. 58.

[90] ECF Nos. 70, 72. The parties jointly moved to amend the scheduling order to extend the dispositive motion deadline on December 17, 2020. ECF No. 44. Although the Court granted the requested extension of time, due to the new dispositive motion deadline's near proximity to the dates then set for various pretrial documents and trial itself and the fact that there was already voluminous briefing on cross-motions for summary judgment, the Court declined to allow for reply briefs.

[91] ECF No. 95 (minute entry).

[92] *Id.*

and the "**OTAF Undisputed Facts**," respectively).[93]   On February 3, 2021, the Parties each likewise filed their responses thereto.[94]

After considering the extensive briefing of the Parties, the undisputed facts as laid out above, and the oral arguments of counsel, the Court concludes that the Trustee Motion should be granted in part and denied in part and that the OTAF Motion should be denied in its entirety.

## III.   <u>Summary Judgment Standard.</u>

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[95]   In instances where both parties have moved for summary judgment, as to each party's motion, all inferences on summary judgment must be drawn in favor of the non-moving party, to the extent that if there appears to be some evidentiary support for the disputed allegations, that motion must be denied.[96] A court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine whether a factual dispute exists for trial.[97]

To support or refute an assertion that a genuine factual dispute exists, the parties must cite to particular parts of the record, show that the materials cited do not establish the absence or presence of a general dispute, or show that an adverse party cannot produce, rather than simply

---

[93] ECF Nos. 101, 102.

[94] ECF Nos. 104 (OTAF's response), 107 (Trustee's response).  Despite the Court's admonishment that the Parties should avoid additional voluminous filings or briefing, astonishingly, a slew of additional appendices, motions, and objections encompassing more than two hundred pages followed.  *See, e.g.*, ECF Nos. 105 (OTAF's Supplemental Appendix to the OTAF Undisputed Facts), 106 (OTAF's Motion to File Document Under Seal), 112 (Trustee's Objection to OTAF's Supplemental Appendix), 113 (OTAF's Response to Trustee's Objection to OTAF's Supplemental Appendix).

[95] *See* Fed. R. Civ. P. 56, as made applicable by Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[96] *Sambula v. Barnhart*, 285 F. Supp. 2d 815, 821 (S.D. Tex. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *McAllister v. R.T.C.*, 201 F.3d 570, 574 (5th Cir. 2000)).

[97] *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).

has not produced, admissible evidence to support the fact.[98] A factual dispute is genuine, and therefore precludes summary judgment, if the evidence supporting it would allow a reasonable factfinder to return a verdict for the non-movant.[99] Finally, and importantly in this case, to prevail at summary judgment on a claim on which a party has the burden of proof at trial, the party must establish "beyond peradventure *all* of the essential elements of the claim or defense."[100]

## IV.   Analysis.

### A.   Count One – Actual Fraudulent Transfers Under § 544(b) and Tex. Bus. & Com. Code § 24.005(a)(1) and Count Two – Actual Fraudulent Transfers Under § 548(a)(1)

The Trustee first seeks summary judgment in his favor on his actual fraudulent transfer claims under the Bankruptcy Code and TUFTA.[101] OTAF seeks summary judgment in its favor only on the Trustee's actual fraudulent transfer claim under TUFTA.[102] The Court, for the reasons enumerated below, finds that, although the Trustee is not entitled to summary judgment on his fraudulent transfer claims in their entirety, he has carried his burden of proving certain elements thereof as a matter of law. The Court also finds that OTAF has failed to carry its burden of establishing that there is no disputed factual issue such that it is entitled to summary judgment in its favor.

The Trustee correctly points out in the Trustee Brief that the elements of an actual fraudulent transfer under the Bankruptcy Code and TUFTA are very similar.[103] Under the Bankruptcy Code, the elements of an actual fraudulent transfer are: (1) a transfer of an interest of the debtor in property; (2) made on or within two years before the date of the filing of the petition

---

[98] Fed. R. Civ. P. 56(c)(1).
[99] *Anderson*, 477 U.S. at 248.
[100] *Bank One, N.A. v. Prudential Ins. Co. of America*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (emphasis added) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).
[101] ECF No. 50 at 2.
[102] ECF No. 47 at 2.
[103] *Compare* 11 U.S.C. § 548(a)(1)(A) *with* TUFTA § 24.005(a)(1).

or entry of the order for relief; and (3) such transfer was made with actual intent to hinder, delay, or defraud any of the debtor's creditors.[104]  Under TUFTA, the elements of an actual fraudulent transfer are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; and (4) with actual intent to hinder, delay, or defraud any creditor of the debtor.[105]  Furthermore, § 544 of the Bankruptcy Code requires that the transfer challenged under state law was of an interest of the debtor in property.[106]

It is beyond reasonable dispute that the Trustee's fraudulent transfer claims involve a debtor, Essential.  Likewise, there is no dispute that the Trustee's claims involve a creditor.[107]  The Trustee's right to avoid transfers is derivative of an actual unsecured creditor's right.[108]  Thus, to establish standing under § 544(b), the Trustee must show the existence of an actual unsecured creditor holding an allowable unsecured claim as of the date of the petition that could avoid the challenged transfer.[109]  Although the Trustee must prove the existence of this so-called "golden creditor," the Trustee need not specifically identify the "golden creditor."[110]  In this case, the Trustee has proven the existence of a "golden creditor."  The record makes clear that Flick held, as of the date of the petition, an allowable unsecured claim and could have sought to avoid the challenged transfers in this case.  As such, the Trustee stepped into Flick's shoes as of the commencement of Essential's bankruptcy case.[111]

---

[104] 11 U.S.C. § 548(a)(1)(A).

[105] TUFTA § 24.005(a)(1); *Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 117 (5th Cir. 2019) (citing *Nwodeki v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 204–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)).

[106] 11 U.S.C. § 544(b)(1).

[107] *Id.*; *see Faulkner v. Kornman (In re The Heritage Organization, L.L.C.)*, 413 B.R. 438, 459–60 (Bankr. N.D. Tex. 2009) (citing cases) (Houser, J.).

[108] *Faulkner*, 413 B.R. at 459.

[109] *Id.*

[110] *Id.*

[111] *Id.*; *see ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 326 (S.D. Tex. 2008) ("The trustee's rights are derivative of an actual unsecured creditor's rights, meaning that the trustee steps into the shoes of the creditor.").

It is furthermore beyond dispute that the transfer of $859,216.00 via the Escrow Transfer occurred within two years of the Court's entry of the Order for Relief.[112] The Escrow Transfer occurred on July 3, 2018. The Court entered the Order for Relief in the Main Case on November 15, 2018. The Trustee also seeks to avoid a number of transfers from Essential to OTAF in the months prior to the Escrow Transfer (the "**Pre-Escrow Transfers**" and, together with the Escrow Transfer, the "**Transfers**"). In the Complaint, the Trustee limited the Pre-Escrow Transfers to transfers occurring between November 30, 2017 and June 22, 2018. This range encompasses a period that is within two years of the Order for Relief. Finally, as discussed above, the Trustee's hypothetical unsecured claim arose as of the date of the filing of the petition. Thus, the Trustee's claim arose shortly—fewer than three months—after the Escrow Transfer.

The Court therefore finds that the Trustee has proven (and OTAF has not raised a genuine factual dispute as to) the second element of an actual fraudulent transfer under the Bankruptcy Code, and as to the first, second, and third elements of an actual fraudulent transfer under TUFTA. The Court now turns its focus to the remaining elements.

### 1. *Transfer of an Interest of the Debtor in Property*

An element common to actual fraudulent transfers under TUFTA and the Bankruptcy Code is that the transfer must be of an interest of the debtor in property. "Interest of the debtor in property" is not defined in the Bankruptcy Code.[113] The Fifth Circuit has interpreted the phrase, however, to refer to *any interest* of the debtor in property that would constitute property of the debtor's bankruptcy estate but for the debtor's transfer of such interest.[114] Under the Bankruptcy

---

[112] As will be discussed below, the parties' briefing tends to treat the sale of Essential's assets and the transfer of funds from the UMB Escrow to OTAF interchangeably. The Trustee, however, has not adequately plead a collapsing of these transactions at this stage. The Court, to maintain clarity, will therefore refer to these transactions separately.
[113] *In re Jenkins*, 617 B.R. 91, 104 (Bankr. N.D. Tex. 2020) (Morris, J.).
[114] *In re Criswell*, 102 F.3d 1411, 1416 (5th Cir. 1997); *Jenkins*, 617 B.R. at 104–05 (citing *In re Merchants Grain, Inc.*, 93 F.3d 1347 (7th Cir. 1996)).

Code, property of a debtor's bankruptcy estate includes all legal and equitable interests in property as of the commencement of the bankruptcy case.[115] TUFTA expressly excludes from the definition of "asset" property of a debtor "to the extent it is encumbered by a valid lien."[116] Thus, the initial point of inquiry is whether, at the time each transfer took place, Essential had any interest in the funds transferred that was not encumbered by a valid lien.[117] For the reasons that follow, the Court concludes that Essential had a legal and equitable interest in the property transferred.

a.   Essential had legal title to the transferred assets.

There is no genuine issue of material fact as to whether Essential had legal title as to the property prior to the Escrow Transfer. Pursuant to the ASA, Essential, as seller, sold the assets described therein to Paramount, as buyer.[118] Under the terms of the ASA, the proceeds from the sale of Essential's assets were transferred to the UMB Escrow.[119] Moreover, OTAF recognized Essential's ownership of the assets in the Consent to Transfer. OTAF was party to, and signatory of, the Consent to Transfer, which provides, in relevant part, that "Seller [collectively defined as Essential, Caufield, and Ludlow] *currently owns* an Online Trading Academy Franchise Business."[120] The fact that the proceeds from the sale were deposited into the UMB Escrow did nothing to divest Essential of legal title to those proceeds, prior to the Escrow Transfer. As OTAF acknowledged in the OTAF Response, Essential retained legal title to the assets (at least) until OTAF received the $859,216.00 payment via the Escrow Transfer.[121] This would apply with equal, if not greater force, as it relates to the Pre-Escrow Transfers.

---

[115] 11 U.S.C. § 541(a)(1).
[116] TUFTA § 24.002(2)(B).
[117] *See Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 459–60 (5th Cir. 2006) ("A trustee cannot avoid transfers of property unless the property would have been in the estate and therefore available to the debtor's general creditors.").
[118] Trustee App. at 0066.
[119] *Id.* at 0067.
[120] *Id.* at 0092 (emphasis added).
[121] ECF No. 73 ¶ 63.

b.      <u>Essential had an equitable interest in the transferred assets.</u>

Although it is beyond dispute that Essential had legal title to the property at the time of the transfer, bare legal title is insufficient for a debtor to have an interest in property—the debt must have an equitable interest in the property transferred.[122]  A debtor lacks equity in an asset if it is fully encumbered by a creditor's lien.[123]  OTAF claims that the transferred assets were fully encumbered  and, thus, Essential did not have an equitable interest in the property at the time of the transfers.[124]  OTAF makes two arguments in support of this argument: (1) it held a perfected lien encumbering all of Essential's assets; and (2) it held equitable title to, or an equitable lien in, all of Essential's assets.  Each of these arguments fails for a number of reasons.

### i. OTAF properly attached a security interest in some, but not all, of Essential's assets.

Congress, in drafting the Bankruptcy Code, "left the determination of property rights in the assets of a bankrupt's estate to state law."[125]  A security interest, under Texas' version of the Uniform Commercial Code (the "**Texas UCC**"), is "an interest in personal property or fixtures which secured payment or performance of an obligation."[126]  A security interest attaches in collateral when three conditions have been satisfied: (1) value has been given; (2) the debtor has rights in the collateral; and (3) the debtor has authenticated a security agreement that provides a description of the collateral.[127]  A description of collateral is sufficient, whether or not it is specific, if it reasonably identifies what is described.[128]  A description of collateral as "all the debtor's

---

[122] *Ramba*, 437 F.3d at 460–61.
[123] *Id.*
[124] ECF No. 73 ¶ 63.
[125] *Butner v. United States*, 440 U.S. 48, 54 (1979).
[126] Tex. Bus. & Com. Code § 1.201(b)(35).
[127] Tex. Bus. & Com. Code § 9.203(b)(1)–(3)(A). Section 9.203(b)(3) provides four conditions, any one of which is sufficient if the prior conditions are also met.  *Id.* § 9.203(b)(3)(A)–(D).  Here, no party has alleged that § 9.203(b)(3)(B)–(D) applies.
[128] *Id.* § 9.108(a).

assets" or using words of similar import does not reasonably identify collateral.[129] These super-generic, catch-all descriptions fail as a matter of law.[130]

Section 8.14 of the 2015 Agreement contains the security agreement at issue. It provides, in relevant part:

> [Y]ou[, Essential,] hereby grant to us[, OTAF,] a security interest in all proceeds of your Online Trading Academy Center and in all of the assets, including equipment, furniture, fixtures, and signs, used by, at or in connection with, your Online Trading Academy Center and its related business.[131]

OTAF asserts that this description is sufficient to grant it a security interest in *all* of Essential's Assets. OTAF's use of the phrase "all of the assets . . . used by, at or in connection with, your Online Trading Academy Center," however, is precisely the kind of omnibus, super-generic collateral description that is expressly forbidden under § 9.108(c) of the Texas UCC.[132] Thus, this part of the description fails as a matter of law to attach a security interest in all of Essential's assets.[133] Section 8.14 does, however, sufficiently describe several categories of collateral—namely, equipment, furniture, fixtures, signs, and "proceeds of the Online Trading Academy Center." Although four of the five categories are easily definable, the final category is less so.

Under the Texas UCC, "proceeds" are defined as, *inter alia*, "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral."[134] Although OTAF asserts that the Court should go outside of the 2015 Agreement for a definition,[135] the 2015 Agreement

---

[129] *Id.* § 9.108(c).

[130] *Cheniere Energy, Inc. v. Parallax Enterprises LLC*, 585 S.W.3d 70, 78 (Tex. Ct. App. 2019); *see CERx Pharmacy Partners, LP v. Provider Meds, LP, et al. (In re ProvideRx of Grapevine, LLC)*, 507 B.R. 132, 163 (Bankr. N.D. Tex. 2014) (Houser, J.) ("For example, while the term 'all the debtor's assets' is statutorily insufficient in a security agreement, Tex. Bus. & Com. Code § 9.108(c), such a description is sufficient in a financing statement.").

[131] Trustee App. at 0136.

[132] *See Cheniere Energy*, 585 S.W.3d at 80 (finding that "all intangible property" was super-generic).

[133] *Id.*

[134] Tex. Bus. & Com. Code § 9.102(a)(65).

[135] OTAF's briefing and argument often conflate what rights Essential had in the franchise, what was sold to Paramount (thereby generating proceeds), and that in which OTAF actually had a security interest. It is without question that a purported secured creditor only has a security interest in identified collateral. *Accord* 9.108(c)

defines the capitalized term "Online Trading Academy Center" as "the physical facility in which you conduct the Franchised Business."[136]  Taking these together, a generous reading yields the conclusion that OTAF purported to take a security interest in whatever was acquired upon the sale, lease, license, exchange, or other disposition of the physical premises in which Essential operated. The Court need not parse this cobbled-together definition, nor whether it is even governed by the Texas UCC,[137] however, because the issue of perfection, or lack thereof, is decisive on this element.

### ii. OTAF failed to perfect any security interest it may have had in Essential's assets

Regardless of whether OTAF properly attached its security interest in the proceeds of the disposition of its purported collateral, the fatal flaw in OTAF's argument is that it failed to perfect any security interest it may have had.  Under the Texas UCC, a security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected.[138]  The Texas UCC defines a lien creditor to include "a trustee in bankruptcy from the date of the filing of the petition."[139]  As discussed above, the operative question as to Essential's interest in the property transferred is whether it *would have* become part of the bankruptcy estate *but for* the transfer. OTAF argues that applicable Fifth Circuit precedent squarely holds that the Transfers are immune

---

(requiring that a description of collateral reasonably identify what is described); *see* Tex. Bus. & Com. Code §§ 9.203(b)(3)(A) (requiring that a security agreement provides a description of collateral to attach a security interest); *see also Cheniere Energy*, 585 S.W.3d at 77–79 (finding that a supergeneric collateral description does not reasonably identify collateral and, therefore, finding that no security interest attached).  Therefore, the Court finds no need to parse through the ASA and the remainder of the 2015 Agreement on a hunt for other possible collateral.

[136] Trustee App. at 0112.

[137] *See* Tex. Bus. & Com. Code § 9.109(a) (delineating the scope of Chapter 9 of the Texas UCC).  Chapter 9 of the Texas UCC applies to, *inter alia*, transactions creating security interests in personal property or fixtures, agricultural liens, sales of accounts, and consignments. *Id.* § 9.109(a)(1)–(6).  Chapter 9 does not, however, apply to transactions creating security interests in *real property*.  It appears to the Court that the physical facility in which Essential conducted its business very likely falls within the latter category of real property.  The Court need not, and therefore does not, however, make a finding on this issue in this Memorandum Opinion.

[138] *Id.* § 9.317(a); *In re Jim Ross Tires, Inc.*, 379 B.R. 670, 675 (Bankr. S.D. Tex. 2007).

[139] Tex. Bus. & Com. Code § 9.102(a)(52)(c).

from avoidance because the funds transferred to OTAF were fully encumbered. Thus, according to OTAF, if it had a perfected security interest in the funds transferred on the date of their transfer, such funds would not have been part of the bankruptcy estate and would not be considered Essential's assets for the purposes of TUFTA.[140]

As OTAF concedes, TUFTA defines a "valid lien" as, essentially, a perfected security interest.[141] The Texas UCC provides a number of ways in which a creditor may perfect a security interest.[142] Foremost among these perfection methods is the filing of the ubiquitous UCC-1 financing statement. Section 9.310(a) of the Texas UCC provides: "Except as otherwise provided in Subsection (b) and § 9.312(b), a financing statement must be filed to perfect *all security interest*."[143] A secured party may also perfect a security interest in certain categories of collateral, including goods and money, by taking possession of the collateral.[144] In fact, a secured party may *only* perfect a security interest in money by taking possession of it.[145]

Here, OTAF concedes that it never filed a financing statement.[146] OTAF's sole argument as to its perfection *in any asset* is that its security interest suddenly became perfected when it took possession of the proceeds of the Asset Sale transferred to the UMB Escrow by Paramount. The Court does not find OTAF's argument persuasive. First, and as discussed above, no part of the 2015 Agreement gave OTAF a security interest in Essential's money. OTAF's security interest extends, at best, to equipment, furniture, fixtures, signs, and "proceeds of the Online Trading

---

[140] *Ramba*, 437 F.3d at 460–61 (holding that a transfer of assets fully encumbered by Citibank's lien could not be avoided pursuant to 11 U.S.C. § 547); TUFTA § 24.002(2)(b).

[141] *Id.* § 24.002(13); *see Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 n.20 (5th Cir. 2009) ("Notably, a security interest in collateral has priority over subsequent judicial liens only if the interest was perfected by filing an appropriate financing statement.").

[142] *See* Tex. Bus. & Com. Code §§ 9.301, et seq.

[143] *Id.* § 9.310(a) (emphasis added).

[144] *Id.* § 9.313(a).

[145] *Id.* § 9.312(b)(3).

[146] ECF Nos. 48 at 28 ("OTAF acknowledges that it did not file any Form UCC-1"), 73 at 15 ("OTAF acknowledges that it did not file any Form UCC-1"), 104 ¶ 35 ("Undisputed that OTAF did not file a UCC-1.").

Academy Center." Money does not fit within this list, nor can it be imputed.[147] Therefore, OTAF never attached a security interest in Essential's money, much less a perfected one.[148]

Second, assuming for the sake of argument that OTAF intended to argue that it had a perfected security interest in the "proceeds" of its purported collateral, which was perfected by possession thereof, OTAF's position would still not be tenable under the Texas UCC. Proceeds are whatever is acquired upon the disposition of collateral.[149] The Texas UCC provides that a security interest in proceeds is perfected *only* if the interest in the original collateral was perfected.[150] The purported collateral creating the proceeds here were "all of Essential's assets." Thus, to be perfected in the proceeds of the Asset Sale, OTAF would have had to perfect its security interest in "all of Essential's assets" prior to their disposition. OTAF conceded that it did not file a financing statement as to even its undisputed collateral—Essential's equipment, furniture, fixtures, and signs—much less all of Essential's assets. Moreover, OTAF presented no persuasive argument that it perfected its security interest by any other method allowed under the Texas UCC. Thus, OTAF did not have a "valid lien" in Essential's assets prior to the Asset Sale, nor in the proceeds thereof. Because OTAF was never a perfected secured creditor as to any of Essential's assets and did not hold a valid lien against them, the remainder of its arguments are not persuasive.

Despite OTAF's protests to the contrary, this Court's ruling is consistent with *Ramba*. *Ramba* was simply about math. The secured lender in *Ramba* had a lien on all of the debtor's assets and was owed more than $25 million.[151] The lender agreed to take $15.6 million to release

---

[147] *ProvideRx*, 507 B.R. at 152–53 (citing *Gilbert Tex. Contr. L.P. v. Underwriters at Lloyd's London*, 327 S.W. 118, 126 (Tex. 2010)) (noting that courts' primary concern in contract interpretation is giving effect to the parties' intent as written).

[148] *See* Uniform Commercial Code ("**UCC**") § 9-102, official comment 5(a) ("As defined in Section 1-201, 'money' is limited essentially to currency.").

[149] Tex. Bus. & Com. Code § 9.102(a)(65).

[150] *Id.* § 9.315(c).

[151] *Ramba*, 437 F.3d at 459.

its liens and allowed approximately $10 million of debt to be assumed by the buyer.[152] As noted by the Fifth Circuit, "had [the buyer] been willing to pay a higher price for the assets rather than assuming the debt, the increase in funds would have gone to [the secured lender], not the estate."[153] Moreover, *Ramba* advises that one needs to assume that transfer never occurred when determining whether the property would have been property of the estate.[154] In that case, it was clear that, had the transfer not occurred, the secured lender would have had a lien that fully encumbered the assets that were sold. Here, the opposite is true. OTAF did not possess a valid lien on the Debtor's assets; therefore, the Debtor had an equitable interest in all of the assets at issue here.

In *Ramba*, the Fifth Circuit distinguished *Sommers v. Burton (In re Conard Corp.)*, a decision which is particularly instructive here. In *Conard*, the trustee sought to recover transfers made by the purchaser of the debtor's assets who, in connection with the sale, assumed an unsecured note made by the debtor in favor of a third-party unsecured lender and made the note payments directly to the unsecured lender after the sale closed.[155] The Fifth Circuit rejected the unsecured lender's claim that the transfers made were not property of the estate, determining that the debtor had an interest in the transfers made by the purchaser to the unsecured lender.[156] The Court's rationale was that the assumption of debt by the purchaser was part of the consideration paid to the debtor during the preference period.[157] It was immaterial that the transfers that the trustee sought to avoid were made by the purchaser (rather than the debtor) to the unsecured lender.[158]

---

[152] *Id.*
[153] *Id.* at 461.
[154] *Id.* at 459.
[155] 806 F.2d 610, 611 (5th Cir. 1986).
[156] *Id.* at 612.
[157] *Id.*
[158] *Id.*

OTAF also relies upon *In re ProvideRx of Grapevine, LLC* and similar cases for the proposition that the Trustee's strong-arm power does not apply in this case. In *ProvideRx*, Judge Houser found that the Chapter 11 debtor could not avoid a creditor's unperfected lien pursuant to § 1107(a) and § 544(a) of the Bankruptcy Code because the property subject to the unperfected lien was not property of the estate as of the petition date after a properly noticed public foreclosure sale of the assets.[159] Were the Trustee pursuing a § 544(a) action to avoid OTAF's unperfected lien, *ProvideRx* might be more appropriately cited.[160] The Trustee has not included a § 544(a) cause of action in his Complaint. Rather, the Trustee has sought to avoid transfers pursuant to §§ 544(b), 547, and 548. Even more importantly, the instant case does not involve assets sold at a properly noticed public foreclosure sale. Rather, OTAF is alleged to have swept Essential's proceeds from a third party sale out of escrow, based only on an unperfected security interest. Thus, *ProvideRx* is not persuasive on this point.[161] Instead, for the reasons explained above, *Conard* is controlling.

The Court therefore finds that OTAF never had a perfected security interest in any of Essential's assets. As such, at the time of the Transfers, Essential had an interest in the funds transferred such that they would have become part of the bankruptcy estate but for the Transfers and were "assets" as defined under TUFTA.[162]

---

[159] 507 B.R. at 168.

[160] *Id.* ("Due to the December 13, 2012 public sale of PM's IP Assets, the Chapter 7 trustee of the PM bankruptcy estate may not avoid CERx's liens on the IP Assets pursuant to the strong-arm powers of 11 U.S.C. § 544.").

[161] It is also worth noting that avoidance issues were not fully briefed in *ProvideRx* as they were in the instant action. *See* 507 B.R. at 167.

[162] OTAF raised additional arguments in its responsive briefing as to relation back and the statute of limitations on lien avoidance. The Court considered these arguments and found them without merit as they, like OTAF's reliance on *ProvideRx*, focused on lien avoidance, rather than whether Essential had an interest in the property transferred. Furthermore, OTAF improperly relies on *Grant v. Kaufman, P.A. (In re Hagen)* as its sole authority for its "relation back" theory. As the Court will discuss in depth below, *Hagen* is distinguishable on several grounds and its applicability in this case is at least partially controverted by intervening Supreme Court precedent. 922 F.2d 742, 744 (11th Cir. 1991); *see generally Fidelity Financial Services, Inc. v. Fink*, 522 U.S. 211 (1998).

### iii. OTAF did not hold equitable title or an equitable lien in any of Essential's assets

In the OTAF Response, OTAF opaquely argues that, even if it did not hold a security interest pursuant to the 2015 Agreement, an amalgamation of the UGA Agreement and the UAS Agreement granted OTAF equitable title to or an equitable lien in certain of Essential's assets as of the date of the Incurable Breach Notice. The foundation for this argument is a provision in both the UGA Agreement and UAS Agreement in identical form that provided:

> Default of Franchise Agreement. [Essential] understands [OTAF] will have full access to all information concerning Franchisees maintained by UGA during the term of this Agreement. In the event of [an] OTA Franchisee Client's uncured default, UGA will automatically transfer all OTA Franchisee Client's rights and benefits under any agreement with UGA to [OTAF] until UGA has been given notice of cure of default by the OTA Franchisee or as otherwise may be determined by OTA Franchise Corp.[163]

OTAF argues that, pursuant to this provision, on Essential's incurable default of the 2015 Agreement, some of Essential's student contracts were "equitably assigned" to OTAF. For the reasons that follow, this argument fails entirely.

First, the provision OTAF relies upon contains terms that are undefined in either the UGA Agreement or the UAS Agreement. Neither agreement defines "Franchise Agreement" or "OTA Franchisee Client." The relevant provision furthermore states only that the undefined "OTA Franchisee Client's" rights and benefits under any agreement with UGA would be transferred to OTAF, but also that such transfer would revert on notice of a cure of the triggering default. The Court is, therefore, left with a multitude of questions as to the specific functionality and factual applicability of this provision.

---

[163] OTAF Sealed App. at 13 (¶ 9 of the UAS Agreement), 22 (¶ 13 of the UGA Agreement); ECF No. 73 at 36 (quoting the same).

Even if the relevant provision were clear, OTAF cites no law and provides no evidence supporting that such an "equitable assignment" actually took place, much less whether it would be tantamount to a security interest, perfected or otherwise.[164] OTAF relies upon one case, *Floyd v. Dykeswill Ltd., (In re Dykeswill, Ltd.)*, in support of this argument. In *Dykeswill*, the court found that an attorney's interest in his client's recovery pursuant to a contingency fee agreement vested when his client entered into a settlement agreement with the opposing party.[165] The court also found that the language of the contingency fee agreement vested the attorney with an equitable interest in the client's recovery.[166]

*Dykeswill* shares almost nothing in common with this case. Neither OTAF, UGA, nor UAS is an attorney and, likewise, none of these entities entered into a contingency fee agreement with Essential.[167] This proceeding is also not a request for the Court to approve a settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, as was the case in *Dykeswill*. Therefore, the Court does not find OTAF's reliance upon *Dykeswill* persuasive.

More importantly, to obtain an equitable lien a movant must show three elements: (1) that there exists an express or implied agreement between the parties demonstrating a clear intent to create a security interest in order to secure an obligation between them; (2) that the parties intended specific property to secure the payment; and (3) that there is no adequate remedy at law.[168]

OTAF did not argue any of these elements, choosing instead to simply state that the UGA Agreement and the UAS Agreement created an equitable lien in its favor on Essential's assets.

---

[164] OTAF provided no evidence of an absolute assignment of Essential's property pursuant to this provision. Likewise, the MOU between Essential, UGA, and UAS, executed in June of 2018 (many months after the Breach Notices) leads the Court to the conclusion that property was never "automatically transferred" to OTAF. ECF No. 104 ¶ 63.
[165] 365 B.R. 683, 688 (S.D. Tex. 2007).
[166] *Id.*
[167] *Id.* at 687–88 (discussing attorneys' rights pursuant to contingency fee contracts under Texas state law).
[168] *Klesch & Co. v. Nauru Phosphate Royalties (Honolulu), Inc. (In re "RONFIN" Series C Bonds Sec. Interest Litig.)*, 182 F.3d 366, 371 (5th Cir. 1999).

Nevertheless, the Court finds that each of the elements fails in this case. The first element fails because OTAF is not a party to either of the agreements on which it relies.[169] Furthermore, the relevant provision in the agreements does not demonstrate a clear intent to create a security interest to secure an obligation *between OTAF and Essential*. Thus, OTAF has not pointed to an express or implied agreement between itself and Essential, nor has it shown that the agreements upon which it does rely demonstrate a clear intent to create a security interest.

The second element requires that the property be identified with "reasonable certainty," such that it may be distinguished from the general assets of the debtor.[170] Here, it is unclear what property the parties intended to constitute security for any obligation. The UGA Agreement and the UAS Agreement identify only "rights and benefits under any agreement with UGA" as the "property" assigned to OTAF in the event of a breach of the 2015 Agreement. This description does not describe any of Essential's property with reasonable certainty, much less the blanket equitable lien OTAF claims in this case.

Finally, OTAF has not shown the absence of an adequate legal remedy for Essential's breaches of the 2015 Agreement. The triggering event for OTAF's alleged equitable lien is a breach of the 2015 Agreement. OTAF has not argued that it could not have filed a breach of contract claim against Essential for damages arising therefrom. As a general rule, "a court in equity should not act when the moving party has an adequate remedy at law."[171] Here, the Court finds that OTAF cannot, as a matter of law, show that there was no adequate remedy at law for Essential's breach of the 2015 Agreement. Therefore, the Court finds that OTAF did not have an

---

[169] OTAF Sealed App. at 15 (showing only signatures on behalf of Essential and UAS), 23 (showing only signatures on behalf of Essential and UGA).

[170] *Klesch*, 182 F.3d at 371 (citing *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1581 (Fed. Cir. 1993); *In re Magrill*, 22 F.2d 757, 758 (5th Cir. 1927)).

[171] *Id.* at 373 (citing *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 381 (1992); *Palmco Corp. v. American Airlines, Inc.*, 983 F.2d 681, 686 n.9 (5th Cir. 1993)).

interest in Essential's property by equitable assignment and did not have an equitable lien in Essential's assets. OTAF is, therefore, left only with whatever security interest it may have had in Essential's assets pursuant to the 2015 Agreement.

In sum, the Trustee has established as a matter of law that the Transfers were of an interest of Essential in property. Thus, the Trustee has conclusively established the first element of his actual fraudulent transfer claim under the Bankruptcy Code and the § 544(b) element for the purposes of the Trustee's actual fraudulent transfer claim under TUFTA. OTAF, for its part, has failed to carry its burden of proving that the Trustee cannot, as a matter of law, prove all the elements of the Trustee's actual fraudulent transfer claims.

### 2. *Intent to Hinder, Delay, or Defraud Essential's Creditors*

The Trustee bears the burden of proving that Essential transferred the funds to OTAF with the intent to hinder, delay, or defraud Essential's creditors.[172] In rare cases, summary judgment may be appropriate on the question of fraudulent intent, "such as when the defendant admits the fraud, the conveyance instrument is fraudulent on its face, the defendant retains an interest in the property inconsistent with the conveyance alleged, or the evidence indisputably reveals that the transfer was made [with] the intent to defraud."[173]

### a. Essential's admission of fraudulent intent in the Flick Matter does not decide the issue of fraudulent intent in this case

The Trustee argues first that the agreed judgment entered in the Flick Matter (the "**Agreed Judgment**"),[174] in which Essential and Caufield admitted their intent to hinder, delay, or defraud

---

[172] *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 596 (5th Cir. 1996) (citing *In re McConnell*, 934 F.2d 662, 665 n.1 (5th Cir. 1991)); *see* 11 U.S.C. § 548(a)(1)(A) (making the debtor's intent the operative inquiry).

[173] *Hoffman v. AmericaHomeKey, Inc.*, Civil Action No. 3:12-CV-3806-B, 2014 WL 7272596, at *11 (N.D. Tex. Dec. 22, 2014) (citing *BMG Music v. Martinez*, 74 F.3d 87, 90 (5th Cir. 1996)).

[174] Main Case, ECF No. 7-2 at 2–4.

creditors, definitively establishes Essential's fraudulent intent as to the Escrow Transfer. OTAF argues that it is not foreclosed from challenging the fact of Essential's fraudulent intent, despite the Agreed Judgment.

The Trustee is correct that Essential was originally bound by the Agreed Judgment entered in the Flick Matter.[175] The Trustee is also correct that, in the Agreed Judgment, it was stipulated that Essential and Caufield admitted to all of the allegations in the complaint filed in the Flick Matter, including their intent to hinder, delay, or defraud creditors.[176] The Trustee's argument as to the qualitative import of this admission fails, however, for several reasons.

First, the transfer at issue in the Flick Matter, and to which the Agreed Judgment relates, was the Asset Sale, not the Pre-Escrow Transfers nor the Escrow Transfer.[177] The Trustee has not, at this juncture, adequately plead a collapsing of the Asset Sale with the Transfers. Thus, a strict reading of the Agreed Judgment does not yield an admission of fraudulent intent as to the Transfers at issue in this case.[178]

Second, even if the admission in the Agreed Judgment did relate to the Transfers, the Agreed Judgment was vacated as to Essential as an act in violation of the automatic stay.[179] A settlement between the Trustee and Flick was later approved by the Court in the Main Case, but

---

[175] *Id.* at 2 (naming Essential as a defendant in the Flick Matter).

[176] *Id.* ("Defendants have . . . admit[ted] the allegations contained in the Complaint."); *see* Complaint, Flick v. Caufield, et al., No. 3:18-cv-1734 (N.D. Tex. July 2, 2018), ECF No. 1 ¶ 73 ("Any such transfer was made with the actual intent to hinder, delay, or defraud Caufield's creditors, and the creditors of [Essential] which he controlled and directed, in order to perpetuate the acts of fraud pleaded in this Complaint.")

[177] Complaint, Flick v. Caufield, et al., ECF No. 1 ¶ 72.

[178] The Court notes that, although the Trustee's counsel brought up in closing argument the possibility of seeking to collapse the transfer of Essential's assets to Paramount with the Escrow Transfer, the Trustee did not raise the issue in a pleading or other filing prior to the hearing on the Summary Judgment Motions. Thus, the Court currently limits the transactions in question to the Pre-Escrow Transfers and the Escrow Transfer.

[179] Order, Flick v. Caufield, et al., ECF No. 31. The Agreed Judgment was entered in the Flick Matter on October 3, 2018, eight days after Flick filed the Petition against Essential. The automatic stay, therefore, was in place when the Agreed Judgment was entered. 11 U.S.C. § 362(a) ("[A] petition filed under section . . . 303 of this title . . . operates as a stay, applicable to all entities[.]"). As a result, the District Court vacated the Agreed Judgment as to Essential on November 6, 2018. Furthermore, although Flick moved for relief from the stay in the Main Case to re-file the Agreed Judgment, that motion was denied on January 17, 2019. Main Case, ECF Nos. 7, 45.

the admissions the Trustee relies upon from the Agreed Judgment are not contained in the approved settlement. The Agreed Judgment is, therefore, not currently enforceable against Essential.

Finally, the Trustee's argument as to the Agreed Judgment amounts to pseudo-estoppel in that it appears that Trustee seeks to prevent OTAF from litigating Essential's fraudulent intent in this case based on an admission in a somewhat related, but distinct, case to which OTAF was not a party. The Court finds that, although the Agreed Judgment may be persuasive direct evidence of Essential's fraudulent intent at trial, it is not conclusive, especially because, as described previously, it is no longer enforceable against Essential. Likewise, the Trustee has not conclusively shown the Court that he is entitled to seek estoppel as to this admission as a matter of law. Thus, the Trustee is left without a definitive basis on which to assert this argument for summary judgment.

   b. <u>The Trustee has not established sufficient undisputed facts that fraudulent intent may be inferred from Caufield's conduct</u>

The Trustee next alleges that certain of Caufield's conduct is sufficient to allow the Court to infer fraudulent intent.[180] Much of the Trustee's cited evidence, however, is unsupported by the record or subject to OTAF's genuine dispute.

For example, the Trustee asserts that the Student Lenders were "required to sign Settlement Agreements" as a condition of the Asset Sale.[181] None of the Trustee's cited evidence, however, shows that the sale was conditioned on the execution of the Student Lenders' settlement agreements. Rather, the Trustee cited to three lines from one of Caufield's depositions that have nothing to do with the asserted fact.[182] Moreover, the payments to the Student Lenders are not

---

[180] ECF No. 56 ¶¶ 49–50.
[181] ECF No. 104 ¶ 44.
[182] *Id.* (citing Trustee App. at 0535); Trustee App. at 0535 ("Q. Those Settlement Agreements contained a release of liability for you personally, correct? A. That wasn't my doing.").

indisputable evidence of fraudulent intent. The only undisputed fact asserted as to Caufield's conduct is that he collected a salary in excess of $75,000.00 between January and June 2018.[183] This fact alone is a far cry from persuading the Court to infer fraudulent intent at the summary judgment stage.

c. <u>The undisputed facts establish several "badges of fraud"</u>

The Trustee's final argument as to Essential's fraudulent intent is that sufficient "badges of fraud" exist from which the Court may infer the requisite intent. As demonstrated above, direct evidence of actual fraud is seldom available.[184] To account for this scarcity, both the Fifth Circuit and Texas law recognize certain "badges of fraud" representing commonly considered circumstantial evidence bearing on actual fraud.[185] TUFTA contains a non-exclusive list of eleven badges of fraud.[186] The Fifth Circuit has recognized its own list of six badges of fraud.[187] The existence of several badges of fraud may raise the presumption of fraudulent intent.[188] The Court will address each of the Trustee's asserted badges of fraud in turn.

<b>i. OTAF's insider status</b>

The Trustee alleges that OTAF was a non-statutory insider of Essential from December 4, 2017 until the Escrow Transfer on July 3, 2018. The Bankruptcy Code and TUFTA both contain non-exhaustive lists of *per se* insiders.[189] These lists are illustrative, however, and courts have recognized parties not on those lists as non-statutory insiders.[190] In the Fifth Circuit, the determination of non-statutory insider status generally focuses on two factors: (1) the closeness of

---

[183] ECF No. 104 ¶ 43.

[184] *In re 1701 Commerce, LLC*, 511 B.R. 812, 835–36 (Bankr. N.D. Tex. 2014) (Lynn, J.).

[185] *Id.* at 836; *Cipolla v. Roberts (In re Cipolla)*, 476 Fed. App'x 301, 307 (5th Cir. 2012) (citing *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)).

[186] TUFTA § 24.005(b).

[187] *Cipolla*, 476 Fed. App'x at 307.

[188] *1701 Commerce*, 511 B.R. at 841–42.

[189] 11 U.S.C. § 101(31); TUFTA § 24.002(7)(B).

[190] *U.S. Bank Nat. Ass'n v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018).

the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's-length.[191] The controlling question as to the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity.[192] An arm's-length transaction is defined as a transaction taking place as if the two parties were strangers.[193]

The Trustee frames his argument using certain more specific insider factors adopted by other courts.[194] Those factors are whether the alleged insider:

> (1) attempted to influence decisions made by the debtor; (2) selected new management for the debtor; (3) had special access to the debtor's premises and personnel; (4) was the debtor's sole source of financial support; (5) generally acted as a joint venture or prospective partner with the debtor rather than an arm's-length creditor; (6) [had] control over the debtor's voting stock; (7) [had] managerial control, including personnel decisions and decisions as to which creditors should be paid; [and] (8) whether the relationship between the debtor and [the creditor] was the result of an arm's-length transaction.[195]

The Fifth Circuit has not adopted these more specific factors, but the Court nevertheless finds that they are a useful framework for analyzing OTAF's alleged insider status in this case.

Specifically, the Court finds that the following facts bearing on OTAF's alleged insider status are undisputed:

1. OTAF required in the Incurable Breach Notice that Caufield step down from managing the Dallas Center and that Ludlow or Sean Manning ("**Manning**") take over management.[196]

---

[191] *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

[192] *Neutra, Ltd. v. Terry (In re Acis Capital Management, L.P.)*, 604 B.R. 484, 535 (N.D. Tex. 2019) (Fitzwater, J.); *In re Premiere Network Servs.*, 333 B.R. 126, 129 (Bankr. N.D. Tex. 2005) (Hale, J.).

[193] *U.S. Bank Nat. Ass'n*, 138 S. Ct. at 967–68 (citing "Arm's-length Transaction," Black's Law Dictionary 1726 (10th ed. 2014)).

[194] ECF No. 56 ¶ 54 (citing *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 80 (Bankr. D. Del. 2010)).

[195] *Broadstripe*, 444 B.R. at 80.

[196] ECF No. 104 ¶ 56; Trustee App. at 0414–13.

2. OTAF, in the Consent to Transfer, conditioned its consent to the Asset Sale on the execution of the Escrow Instructions, which required, *inter alia*, payments to specific parties, including itself and the Student Lenders.[197]

3. OTAF's Texas counsel drafted the settlement agreements—which included releases and non-disparagement clauses in favor of OTAF—to be signed by the Student Lenders.[198]

4. OTAF conducted pre-settlement correspondence directly with the Student Lenders.[199]

5. OTAF knew that, in connection with the execution of the ASA and the Escrow Agreement, there would not be sufficient funds to pay all of Essential's creditors.[200]

6. OTAF had access to Essential's premises, personnel, and financial data, including Essential's bank accounts and administrative access to Essential's QuickBooks records.[201]

7. OTAF had the power to inspect Essential's premises, interview its employees, talk to its customers, order Essential to open its books and records, and demand copies of bank statements and tax returns.[202]

8. OTAF had knowledge as early as April of 2018 that UGA and UAS had begun withholding funds from Essential.[203]

9. OTAF negotiated with UGA for the deposit of funds withheld by UGA and UAS in the UMB Escrow.[204] UGA and UAS, as a result, made the negotiated deposit in the amount of $149,955.00.[205]

The Court finds that the undisputed facts listed above establish that OTAF was a non-statutory insider beginning from December 4, 2017 when it delivered the Incurable Breach Notice

---

[197] ECF No. 104 ¶ 49; Trustee App. at 0093, Section 2.1.2 (setting conditions precedent to consent to the execution of escrow instructions, including payments to the "student lenders and student investors.")

[198] ECF No. 104 ¶ 52 ("Undisputed that the settlement agreements were initially drafted by the attorneys for OTAF.").

[199] *Id.* ¶ 53. OTAF did not raise a relevant, genuine dispute. The Trustee cited to sufficient deposition testimony and emails between Student Lenders and OTAF personnel, indicating the existence of direct communications. This fact is, therefore, undisputed.

[200] *Id.* ¶ 55; Trustee App. at 0682–85 (Longobardi's deposition testimony that he was aware that Essential owed legal fees to Clark Hill Strasburger, Essential's legal counsel in the transaction, and that he understood that they would not receive any funds from the proceeds of the sale of Essential's assets).

[201] *See, e.g.*, OTAF App. at 109 (Section 8.1(k) providing that OTAF reserves "the right to use, and to have full time unrestricted access to, all registers, computers, and any other systems, and the information and data they contain."), 110 (Section 8.2(c) requiring that Essential use QuickBooks with "us[, OTAF,] named as an administrator.").

[202] ECF No. 104 ¶ 59; OTAF App. at 111–12 (encompassing Section 8.7 entitled "Our inspections, etc." and Section 8.8 entitled "Audit.").

[203] ECF No. 104 ¶ 62.

[204] *See supra*, at 10 n.62 (discussing the evidence supporting this fact).

[205] ECF No. 104 ¶ 64.

34

to Essential. These facts show a pattern of conduct by which OTAF attempted to influence decisions that would otherwise have been left to Essential. The most glaring of this conduct is OTAF's demand that Caufield step down from managing Essential and that new management be selected from between two specific individuals, Ludlow and Manning. Thus, OTAF sought to select new management for Essential.

The facts above also establish that OTAF had nearly unfettered access to every aspect of Essential's operations and financial information. In reviewing the 2015 Agreement, it is difficult to pick out any part of Essential's business to which OTAF did not grant itself access. OTAF and Essential also acted more like joint venturers than an arm's-length creditor and debtor.

In the Breach Notices and other correspondence sent to Essential in early 2018, OTAF repeatedly warned of its right to terminate Essential's franchise license. OTAF also repeatedly placed conditions on its willingness to forego terminating Essential's franchise license. These conditions included placing deadlines, at times less than a week in advance, on the execution of agreements and the closing of the Asset Sale.

Turning to the Fifth Circuit's insider factors, the Court finds that the undisputed facts show that OTAF utilized its closeness and overwhelming authority over Essential to gain an advantage in the sale process. OTAF had complete control over the content of the Escrow Agreement, dictating that itself and the Student Lenders would be paid from the UMB Escrow without regard to any of Essential's other creditors.[206] OTAF almost unilaterally controlled the negotiation and ultimate consummation of the ASA and the Escrow Agreement, such that the Escrow Transfer was not made at arm's-length. A review of Schedule 1 to the Escrow Agreement shows that OTAF

---

[206] Trustee Sealed App. at 0043 (requiring the ASA designate the distribution of funds first to itself then to the Student Lenders); *id.* at 0093 (conditioning OTAF's consent to the transfer of Essential's assets on the execution of escrow instructions "approved in writing by [OTAF]").

retained sole authority to deliver written escrow instructions to UMB during the distribution from the UMB Escrow.[207]

Thus, the undisputed facts show that OTAF was a non-statutory insider from December 4, 2017 as a matter of law.

OTAF attempts to argue that it was not a non-statutory insider because all of its actions were taken within the bounds of its rights under the 2015 Agreement. OTAF cites to a wide swath of case law in an attempt to support of its position.[208] OTAF does not cite, however, to one case from the Fifth Circuit supporting its position. Furthermore, the precedent OTAF relies upon is distinguishable. OTAF cites *Meeks v. Bank of Rison (In re Armstrong)* for the proposition that it exercised no more than financial oversight and not the day-to-day control required to be deemed a non-statutory insider.[209] In *Meeks*, the debtor's bank determined for the debtor which deposits would receive immediate credit and which checks would be paid or held for later.[210] The *Meeks* court ultimately found that the bank had not exerted sufficient control to be considered a non-statutory insider due, in part, to the bank's failure to direct the debtor's day-to-day activities.[211]

The Court finds *Meeks* distinguishable on two bases. First, the court in *Meeks* noted that its findings were particularly applicable to a *bank* acting as a creditor.[212] OTAF is not a bank, and thus the analogy to *Meeks* is weakened. Second, OTAF exerted significant control over Essential in this case. OTAF, as a franchisor, had a much higher degree of day-to-day control under the 2015 Agreement than a simple lender would. Moreover, OTAF admits that it *exercised* this control, especially following the Breach Notices. In those Breach Notices, OTAF deemed

---

[207] Trustee App. at 0055–60.
[208] ECF No. 73 ¶¶ 75–81.
[209] 231 B.R. 746, 749 (Bankr. E.D. Ark. 1999).
[210] *Id.* at 748.
[211] *Id.* at 750.
[212] *Id.* at 749, 750 ("In determining whether a creditor, *and particularly a bank*, has the requisite level of control . . . ." (emphasis added)).

Essential's defaults *incurable* and provided severely limited options for avoiding the outright termination of the franchise license. Although Caufield may have independently located Paramount as a buyer, OTAF thereafter forced the Asset Sale's completion through tight timelines and demands on execution and delivery of deal documents. As described above, OTAF nearly unilaterally controlled the negotiation and drafting of the deal documents, including the ASA, the Escrow Agreement, and the settlement agreements with the Student Lenders. Finally, OTAF ensured that it would be paid in full in the process to the detriment of other creditors. Thus, *Meeks* does not support OTAF's position.

OTAF also heavily relies upon *In re Congrove*, a case in which the Sixth Circuit Bankruptcy Appellate Panel held that McDonald's Corporation would not be considered an insider for the purposes of a fraudulent transfer action.[213] In *Congrove*, McDonald's, a franchisor, notified the debtors, its franchisees, that their financial position was critical.[214] After negotiations, the debtors and McDonald's agreed that the franchise licenses would be terminated and the debtors would convey all of the restaurant assets to McDonald's, but the agreement between them did not contemplate any monetary consideration.[215] After the debtors and McDonald's executed the franchise termination agreement, McDonalds paid a total of $768,060.38 of the debtors' more than $1.5 million in debt.[216]

The court in *Congrove* ultimately held that the debtors "presented no evidence of day-to-day, extra-contractual control by McDonald's" and that the record contained "no indication that the relationship . . . went beyond an arm's-length franchisor-franchisee relationship."[217] As with

---

[213] 330 B.R. 880 (Table), 2005 WL 2089856 (6th Cir. B.A.P. Aug. 31, 2005), *aff'd*, 222 Fed. App'x 450 (6th Cir. 2007).
[214] *Id.* at *2.
[215] *Id.*
[216] *Id.*
[217] *Id.* at *8.

OTAF's reliance upon *Meeks*, herein, lies OTAF's problem—the undisputed record here is replete with evidence of OTAF's exercise of control over Essential. The facts supporting this conclusion have been laid out several times. OTAF is correct when it states that many of its actions were contemplated by the 2015 Agreement. OTAF has not cited any law, however, that a franchisor's exercise of contractual rights in a way that effectively controls a franchisee, its contractual undertakings, the sale of its assets, and the selection and payment of its creditors *per se* insulates its actions from an insider analysis.

Nor does the Court intend to state here that every franchisor is *per se* a non-statutory insider. Rather, the Court's finding, on the undisputed facts of this case, is that OTAF used its close relationship with Essential to gain better treatment than it may otherwise have obtained and that, at every step after the Incurable Breach Notice on December 4, 2017, OTAF dealt with Essential at less than arm's-length, including as to the Escrow Transfer.

As such, the Court finds that the undisputed facts show that OTAF was a non-statutory insider from December 4, 2017 up to and including July 3, 2018, when the Escrow Transfer occurred.

### ii. Concealment of the transfer from Essential's creditors

The Trustee next alleges that Caufield concealed the Asset Sale and the Escrow Transfer from his and Essential's other creditors. As an initial note, the Trustee makes no argument that Caufield attempted to conceal the Pre-Escrow Transfers. OTAF likewise limits its argument to the Asset Sale and the Escrow Transfer. Thus, the Court will focus on whether the Escrow Transfer itself was concealed from Essential's other creditors.

Both the Trustee and OTAF suffer from a similar problem here as they did in discussing the Agreed Judgment—the cited evidence relates primarily to the Asset Sale, not the Escrow

Transfer. Moreover, although the Trustee's citations to the record at times support that the Escrow Transfer may not have been well-publicized, at other times the Trustee's evidence cuts against his own argument.

Caufield testified at deposition that he did not inform the Internal Revenue Service or the Texas Comptroller, both of which filed claims in the Main Case, of the Asset Sale.[218] Caufield further testified that he never posted a notice of the Asset Sale and that he was unaware of any other way that someone outside of Essential or OTAF could have learned of it.[219] Although this evidence tends to show that Caufield failed to publicize the Asset Sale, it has little bearing on whether he actually *concealed* it, and even less bearing on whether he or Essential concealed the Escrow Transfer.

The Trustee's argument is similar to that made by the creditor seeking to unwind a deed in lieu agreement in *In re 1701 Commerce, LLC*.[220] In that case, Judge Lynn analyzed whether the execution of a deed in lieu agreement between the debtor and the then-owner of a hotel constituted a fraudulent transfer.[221] The court analyzed the badges of fraud under TUFTA, including the debtor's alleged concealment of the deed in lieu agreement.[222] The Court found that some evidence suggested that the similarity between the debtor's and the owner's legal names "was to prevent potential third-party purchasers" from learning of the hotel's financial distress.[223] The court ultimately found, however, that even though the debtor "may have been less than enthusiastic" in publicizing the deed in lieu agreement, the evidence did not support that the debtor concealed it.[224]

---

[218] Trustee App. at 0539.
[219] *Id.* at 0540.
[220] 511 B.R. at 816.
[221] *See generally id.*
[222] *Id.* at 837–38.
[223] *Id.* at 837 (emphasis added).
[224] *Id.* at 838.

Here, the same holds true.  The Trustee's undisputed evidence shows, at best, that Caufield was less than enthusiastic in advertising the Asset Sale.  Furthermore, the Trustee cites to the very evidence that undermines this badge.  Although it is undisputed that Caufield testified he did not actively notify the IRS or the Texas Comptroller, he likewise testified that he *did* notify one of his personal creditors, Julie Tsang, of the Asset Sale.[225]  Caufield further testified that "at some point along the way . . . [Flick] knew that [Essential] was being sold."[226]

OTAF primarily argues in response that it was a creditor, as were several of Essential's employees, and that OTAF and the employees were aware of the Asset Sale.  Although accurately stating the factual situation, OTAF's argument strains logic.  First, again, the Asset Sale is not directly at issue in this case, the Escrow Transfer is.  Even extending OTAF's argument to the Escrow Transfer, the thrust of OTAF's argument would be that Essential did not conceal the Escrow Transfer from its creditors because OTAF, admittedly a creditor, *but also the recipient of the Escrow Transfer*, was aware of it.  To construe the badge of fraud to be absent because the recipient of the alleged fraudulent transfer knew about it is more than a bit self-serving.

Regardless of OTAF's failure to meaningfully respond, at summary judgment the Court does not weigh evidence.[227]  The Court must take the undisputed facts in the light most favorable to the non-moving party.[228]  Here, the Court is compelled to find that Caufield's testimony shows that, although he did not inform certain of Essential's creditors of the Asset Sale, he did not actively conceal it either.  The Trustee likewise failed to cite to specific evidence bearing on whether Essential concealed the Escrow Transfer specifically.  Thus, the Court finds that the undisputed facts do not support this badge's presence at the summary judgment stage.

---

[225] Trustee App. at 0540.
[226] *Id.* at 0541.
[227] *Peel & Co.*, 238 F.3d at 394.
[228] *McAllister*, 201 F.3d at 574; *Sambula*, 285 F. Supp. 2d at 821.

### iii. Essential being sued or threatened with suit prior to the Escrow Transfer

The Trustee alleges that before the Escrow Transfer, Essential had been sued or threatened with suit. As Judge Lynn explained in *1701 Commerce*, a creditor's demand for payment before an alleged fraudulent transfer is a sufficient threat of suit for the purposes of fraud evidence.[229] In this case, it is undisputed that OTAF made a demand for immediate payment in the Past Due Notice on December 4, 2017.[230] Moreover, Caufield testified that, prior to the Escrow Transfer, Flick threatened to sue Essential.[231] OTAF does not genuinely dispute these facts. As such, this badge is present in this case as a matter of law.[232]

### iv. Essential's insolvency at the time of the Transfers or the Transfers rendering Essential insolvent

The Trustee alleges that it is undisputed that Essential was insolvent at the time of the Transfers. The Trustee's primary support for this position is the report of his retained expert stating as much.[233] The Trustee further argues that OTAF's retained expert did not express an opinion as to insolvency in his report and was not asked to do so.[234] OTAF initially appeared to concede that Essential was insolvent in the OTAF Response.[235] During the hearing, however, OTAF retracted this concession in favor of arguing that Caufield provided to OTAF monthly balance sheets showing that Essential was solvent.[236]

---

[229] 511 BR. at 838.

[230] Trustee App. at 0420–0421.

[231] *Id.* at 0542.

[232] OTAF responded to the Trustee's assertion of this fact on two fronts. ECF No. 104 ¶ 69. First, OTAF alleges that it did not threaten to sue Essential. Although this is true, as noted above, a creditor's demand for payment has been considered a sufficient threat. *Supra*, at 39 n.219. Second, OTAF alleges it had no knowledge of Flick's threatened lawsuit prior to the Escrow Transfer. OTAF's knowledge is irrelevant to determining whether Essential had been threatened with suit.

[233] Trustee App. at 0323–36.

[234] *See generally id.* at 0188–0207; *see id.* at 0748 ("I wasn't asked to look at insolvency.").

[235] ECF No. 73 at 43.

[236] ECF No. 104 ¶ 15; *see* Def. Resp. App. 778–1053.

The balance sheets cover the period January 31, 2017 through March 31, 2018.[237] This period does not include the months leading up to the Escrow Transfer. The Trustee's expert, likewise, formed his opinion as to Essential's insolvency after review of balance sheets covering the period December 31, 2013 through December 31, 2017, and the balance sheet for April 11, 2018.[238] The parties' respective evidence is squarely contradictory. Thus, the Court finds that a genuine issue of material fact exists as to Essential's insolvency at the time or as a result of the Escrow Transfer.

### v. Timing of the Transfers shortly before or after a substantial debt was incurred

Next, the Trustee alleges that all of the Transfers occurred shortly before or after a substantial debt was incurred, relying upon the proofs of claim that Flick and the IRS filed in the Main Case. OTAF, in response, flatly states, without further explanation or citation to the record or applicable precedent, that "[t]his did not happen" and that, therefore, this badge favors OTAF.[239]

The Escrow Transfer occurred on July 3, 2018. Less than three months later, on September 20, 2018, Flick and Essential entered into the Flick Settlement, pursuant to which Essential became indebted to Flick in the amount of $546,265.11.[240] These facts are not reasonably disputed. Thus, in the absence of argument or controverting evidence from OTAF, the Court finds that this badge of fraud is present in this case as a matter of law as to the Escrow Transfer.

### vi. The Asset Sale was a transfer of all or substantially all of Essential's assets

The Trustee next alleges that the Asset Sale was a transfer of all, or substantially all, of Essential's assets. As has been stated repeatedly thus far, both parties focus on the wrong transfer.

---

[237] *Id.*
[238] Trustee App. at 0325, 0343–44.
[239] ECF No. 73 at 43.
[240] Main Case, Claim No. 9-1 at 5–16.

The Trustee accurately states that the Asset Sale transferred all or substantially all of Essential's assets to Paramount. The correct question, however, is whether the Escrow Transfer was a transfer of substantially all of Essential's assets. OTAF, in response, restates its general argument that no transfer occurred at any point because any assets were fully encumbered by its purported lien.

Neither party offered an argument as to whether the Escrow Transfer and its accompanying reduction in Essential's remaining assets was a transfer of all or substantially all of Essential's assets.[241] Nevertheless, the Court will perform its own analysis. In *In re Sissom*, the court found that a transfer of between 70% and 75% of the debtor's assets, depending on their valuation, was "unquestionably a [transfer] of substantially all of the Debtor's assets."[242]

Reviewing the UMB Escrow statement in conjunction with the Escrow Agreement shows that, after Paramount's initial deposit, disbursements totaling $1.175 million were paid to several of Essential's employees and the Student Lenders.[243] Thus, at the time of the Escrow Transfer, the balance of the UMB Escrow was approximately $1.12 million. After the Escrow Transfer, the balance of the UMB Escrow was approximately $261,000.00. The Escrow Transfer, therefore, represented approximately a 77% decrease in the available funds which were, after the Asset Sale, the only remaining identifiable assets of Essential.

These facts are not reasonably disputed. Thus, the Court finds that the undisputed evidence shows that the Escrow Transfer, representing approximately 77% of Essential's remaining assets

---

[241] OTAF's argument that no transfer occurred because Essential's assets, as sold to Paramount, were fully encumbered by its lien is irrelevant to the question of whether the Escrow Transfer was a transfer of substantially all of Essential's assets. Furthermore, because the Court finds that OTAF did not hold a valid lien, such argument is without merit.

[242] 366 B.R. 677, 697 (Bankr. S.D. Tex. 2007). The court in *Sissom* cited other cases in which courts found transfers representing 30% of a debtor's assets and 77% of a debtor's assets to be transfers of substantially all of the respective debtors' assets. *Id.* at 697 n.30 (citing *In re Wright*, 353 B.R. 627, 652 (Bankr. E.D. Ark. 2006); *In re Knippen*, 355 B.R. 710, 735 (Bankr. N.D. Ill. 2006)).

[243] Trustee Sealed App. at 0053–58; Trustee App. at 0055–60 (detailing the order in which UMB was to make disbursements from the UMB Escrow).

at that time, was a transfer of substantially all of Essential's assets. This badge is present in this case as a matter of law.

### vii. No reasonably equivalent value

Whether Essential gave reasonably equivalent value in the Transfers is also an element of the Trustee's Counts Three and Four for constructive fraudulent transfers. The Court will discuss this issue in detail below. For the purposes of the badges of fraud, and consistent with the Court's finding below, the Court finds that the Trustee has failed to carry his burden of proving that Essential did not receive reasonably equivalent value as to the Transfers.

### viii. Essential's and Caufield's credibility

Finally, the Trustee asserts that Caufield's alleged lack of credibility, considering his business acumen, is an additional badge of fraud that is indisputably present in this case. In support of this argument, the Trustee cites *In re Ritz*, in which the court found that the debtor's lack of credibility was evidentiary of his fraudulent intent.[244] In *Ritz*, the court found that the debtor was not a credible witness at trial for numerous reasons, including that the record was "replete with the [d]ebtor's contradictions on several very germane issues."[245] In considering whether this lack of credibility should be considered a badge of fraud, the court noted that, in the Fifth Circuit, debtors with business acumen should be held to a higher standard.[246] Thus, the court found that, considering the debtor's business acumen, his lack of credibility as a witness at trial was evidentiary of his fraudulent intent.[247]

Here, the Trustee attempts to invite this Court to determine Caufield's credibility at the summary judgment stage, a task that is more appropriately reserved for trial. This purported badge

---

[244] 567 B.R. 715, 752 (Bankr. S.D. Tex. 2017).
[245] *Id.* at 733–34.
[246] *Id.* at 752.
[247] *Id.*

44

of fraud, therefore, is not a proper issue to address at this time.  The Court makes no finding as to its existence or absence in this case.

In summary, the Court finds that the undisputed facts show the following badges of fraud are present in this case as a matter of law: (1) OTAF was a non-statutory insider from December 4, 2017 onward; (2) Essential had been sued or threatened with suit at the time of the Escrow Transfer; (3) Essential became indebted to Flick for a substantial sum shortly after the Escrow Transfer; and (4) the Escrow Transfer was a transfer of substantially all the remaining assets of Essential.  The Court, conversely, finds that the following badges are either subject to a genuine issue of material fact, unsupported by the summary judgment record, or inappropriate for consideration: (1) Caufield and Essential concealed the Escrow Transfer from Essential's creditors; (2) Essential was insolvent at the time of, or rendered insolvent by, the Escrow Transfer; (3) Essential did not give reasonably equivalent value in exchange for the Transfers; and (4) Caufield's lack of credibility, considering his business acumen, is evidentiary of his fraudulent intent.

### d.      OTAF has sufficiently alleged a legitimate business purpose

The existence of several badges of fraud may raise the presumption of fraudulent intent, but this is not the end of this inquiry.[248]  Once a plaintiff establishes the presence of badges of fraud, the burden then shifts to the defendant to show that a legitimate business purpose exists for the challenged transfer.[249]  The test for determining whether an alleged purpose for a transfer was legitimate is a four-part inquiry into whether the transfer was: (1) pursuant to a standard business

---

[248] *1701 Commerce*, 511 B.R. at 841–42; *Faulkner*, 413 B.R. at 464.

[249] *1701 Commerce*, 511 B.R. at 841–42 ("The presumption of fraud raised by the presence of multiple badges may be rebutted if a legitimate purpose exists for the transfer."); *Faulkner*, 413 B.R. at 466 ("Thus, as relevant here, this Court concludes that if the Trustee establishes the existence of several badges of fraud, . . . the Defendants will bear the burden of persuasion on any legitimate supervening purpose for each of the Transfers."); *see Duncan v. First Nat'l Bank of Cartersville, Ga.*, 597 F.2d 51, 56 (5th Cir. 1979) (holding that where badges of fraud make out a strong prima facie case of fraud the burden of proof is shifted to the defendant to show good faith).

practice; (2) an arm's-length transaction; (3) voluntary or effectively forced upon the debtor; (4) for proper consideration.[250]

Here, the Court has found that the Escrow Transfer was not an arm's-length transfer and was effectively forced on Essential by OTAF through the Notices of Default, Consent to Transfer, and the Escrow Agreement. Conversely, the Court finds, and will discuss below, that there is a genuine issue of material fact as to the reasonably equivalent value Essential received in exchange for the Escrow Transfer, which dovetails with the "proper consideration" factor of the "legitimate business purpose" inquiry. The Court likewise finds, and will discuss below, that, although the Escrow Transfer was not in the subjective ordinary course of business between Essential and OTAF, the Court currently has no evidence properly before it as to the *objective* ordinary course of business in the relevant industry, which is on par with the "standard business practice" factor of the "legitimate business purpose" inquiry. Thus, issues of material fact remain to be resolved as to two of the four factors listed above.

Furthermore, "when viewed from the realistic vantage point" of a distressed franchisee-franchisor relationship, the Court finds that OTAF has raised, at the very least, a sufficient specter of a legitimate business purpose for the Escrow Transfer to prevent entry of summary judgment against it.[251] It is undisputed that the Escrow Transfer was made on account of a substantial debt owed by Essential to OTAF. It is furthermore undisputed that OTAF's course of conduct was at least contemplated by the 2015 Agreement. Thus, because two of the four "legitimate purpose" factors are unresolved and OTAF has sufficiently asserted the outline of a legitimate business

---

[250] *1701 Commerce*, 511 B.R. at 842 (citing *In re Womble*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003)); *see Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 420–21 (5th Cir. 1990) (stating four factors considered in determining the debtor's lack of fraudulent intent).

[251] *1701 Commerce*, 511 B.R. at 842 ("But, when viewed from the realistic vantage point of a Property value coinciding with the outstanding secured debt, a legitimate purpose is apparent.").

purpose on this summary judgment record, the Court finds that there are genuine issues of material fact as to Essential's fraudulent intent.

In summary, the Trustee has established as a matter of law all elements of Counts One and Two for actual fraudulent transfers under the Bankruptcy Code and TUFTA, except that there are genuine issues of material fact as to Essential's fraudulent intent. Thus, the only issue remaining for trial on these causes of action is fraudulent intent.

**B. Count Three – Constructive Fraudulent Transfers under § 548(a)(1)(B) and Count Four – Constructive Fraudulent Transfers under § 544(b) and TUFTA § 24.006**

    *1.    Amendment of the Trustee's Complaint*

There is a plethora of issues regarding the Trustee's Count 4 seeking to avoid transfers under § 544(b) of the Bankruptcy Code and § 24.006(b) of TUFTA. In the Complaint, the Trustee states a claim for "Avoidance of Fraudulent Transfers to Present Creditors" under "11 U.S.C. § 544(b) and [TUFTA] *§ 24.006*."[252] The Trustee, more specifically, alleges in the Complaint that the Transfers are avoidable under § 24.006(b), which provides that a transfer "is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."[253]

In the Trustee Brief, however, the Trustee argues that he "seeks to avoid the [Transfers] as constructive fraudulent transfers under . . . *Section 24.005[(a)](2) of TUFTA*."[254] The Trustee goes on to recite and argue the elements thereunder, namely: "(1) lack of reasonably equivalent value

---

[252] ECF No. 1 at 12 (heading) (emphasis added).

[253] *Id.* ¶ 51; TUFTA § 24.006(b).

[254] ECF No. 56 ¶ 84 (emphasis added). As discussed above, in the Trustee Motion, the Trustee did not originally appear to seek summary judgment as to the fourth count in the Complaint. Conversely, in the Trustee Brief, he appears to affirmatively seek summary judgment as to the fourth count in the Complaint. Therefore, the Court construed the Trustee Motion to seek summary judgment as to the first four counts in the Complaint, consistent with the Trustee Brief and OTAF's briefing in general.

for the transfer; and (2) the [transferor] was 'financially vulnerable' or insolvent at the time of the transaction."[255] OTAF responded in kind, addressing the Trustee's argument under § 24.005 in the OTAF Response without noting that the Trustee was arguing a different cause of action than what he pled.

Even more confusingly, however, OTAF moved for summary judgment in its favor as to the Trustee's originally stated claim under § 24.006 of TUFTA.[256] OTAF's argument that it is entitled to summary judgment on this claim is that OTAF was not an insider and that TUFTA does not apply in this case because all of the assets in question were encumbered by its purported lien. Both of these arguments appear to be geared toward the elements under § 24.006(b). OTAF did not, however, recite those elements in the OTAF Brief, nor did it cite to § 24.006 at all in the substantive portion of the OTAF Brief.[257]

Finally, at oral argument, both parties also focused only on the elements under § 24.005 of TUFTA, rather than § 24.006.[258]

Rule 56 provides that "[a] party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought."[259] Rule 15, however, provides that pleadings may be amended beyond the 21-day "amendment as a right" period with leave of court, which should be freely given "when justice so requires."[260] Furthermore, in the Fifth Circuit, even if not explicitly stated, a request for leave to amend may be *inferred* when a party raises new claims

---

[255] *Id.* (citing *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 562 & n.21 (Tex. 2016); TUFTA § 24.005(a)(2)).

[256] ECF No. 47 at 2 ("Defendant seeks summary judgment on the . . . Fourth Claim for Avoidance of Fraudulent Transfers to Present Creditors [under] . . . § 24.006."); ECF No. 48 at 8 (same).

[257] The only place § 24.006 is mentioned in the OTAF Brief is in the prefatory paragraph, which appears to be a repetition of the OTAF Motion.

[258] The parties' argument and briefing collaterally addressed some relevant issues to a claim under § 24.006(b) of TUFTA. For example, one requirement thereunder is that the challenged transfer was made to an insider of the transferor. *Id.* The parties fully briefed and argued OTAF's insider status, but primarily did so as that issue relates to badges of fraud, rather than § 24.006.

[259] Fed. R. Civ. P. 56(a).

[260] Fed. R. Civ. P. 15(a)(2).

in summary judgment pleadings.[261] Whether to grant an inferred request for leave to amend is determined by analyzing whether there is an apparent or declared reason for denial, such as, *inter alia*, undue delay, bad faith or dilatory motive on the part of the purported movant, undue prejudice to the other party by virtue of allowance of the amendment, or futility of amendment.[262]

Here, the Parties have fully briefed and argued causes of action under both § 24.005(a)(2) and § 24.006(a) of TUFTA. OTAF has had numerous opportunities to assert that the Trustee pled one claim and sought summary judgment on others. As such, the Court finds that, although the Trustee did not explicitly seek to amend the pleadings, such a request should be inferred from the Summary Judgment Motions, responses thereto, and oral argument.[263] Moreover, given the fulsome briefing and argument, the Court concludes that the amendment will not result in unfair surprise or prejudice to OTAF.[264] The Court, therefore, deems the Complaint amended to assert causes of action under §§ 24.005(a)(2), 24.006(a), and 24.006(b) of TUFTA.

### 2. *Constructive Fraudulent Transfer under § 24.006(b) of TUFTA*

Section 24.006(b) of TUFTA provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." The Court has already addressed OTAF's arguments for summary judgment as to the Trustee's pled cause of action under this section. First, OTAF was a

---

[261] *ProvideRx*, 507 B.R. at 166 (citing *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 989 n.2 (5th Cir.2008); *Whitmire v. Victus Ltd.*, 212 F.3d 885, 889 (5th Cir.2000); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir.1972)) (internal quotations and citations omitted) (emphasis added).

[262] *Id.* at 166–67 (quoting *Whitmire v. Victus Ltd.*, 212 F.3d 885, 889 (5th Cir. 2000)).

[263] It is also noteworthy to mention that, while the Court had this matter under advisement, the Parties filed their Proposed Joint Pretrial Order and their respective Proposed Findings of Fact and Conclusions of Law. ECF Nos. 153, 158, 161. The apparent confusion over the Trustee's fourth cause of action carried over into those filings, with each party treating the Complaint as including causes of action under §§ 24.005(a)(2) and 24.006(a), further underscoring the propriety of inferring a request to amend the Complaint.

[264] Additionally, as will be discussed below, §§ 24.005(a)(2) and 24.006(a) of TUFTA closely mirror § 548(a)(1)(B) of the Bankruptcy Code, further indicating that OTAF will not be unfairly surprised or prejudiced by the amendment.

non-statutory insider from December 4, 2017 onward. Second, OTAF never perfected its security interest, thus all of Essential's assets at all relevant times met the TUFTA definition of "asset." OTAF, therefore, is not entitled to summary judgment in its favor on this claim.

3.     *Constructive Fraudulent Transfers under § 548(a)(1)(B) of the Bankruptcy Code and §§ 24.005(a)(2) and 24.006(a) of TUFTA*

A trustee in bankruptcy may avoid a transfer as constructively fraudulent under the Bankruptcy Code if: (1) the transfer was of an interest of the debtor in property; (2) the transfer was made or incurred on or within two years before the date of the filing of the petition; (3) the debtor voluntarily or involuntarily received less than reasonably equivalent value in exchange for such transfer or obligation; and (4) as relevant in this case, the debtor was insolvent on the date that the transfer was made or became insolvent as a result of the transfer.[265] Under TUFTA, a transfer is constructively fraudulent if: (1) the debtor transferred an interest in property;[266] (2) without receiving reasonably equivalent value in exchange for the transfer; and (3) while the debtor was insolvent, or became insolvent as a result of the transfer.[267]

As discussed above, the undisputed facts show that the Transfers were of an interest of Essential in the property transferred and all the Transfers occurred within two years of the date of the filing of the Petition. The Court therefore grants summary judgment in the Trustee's favor as to those elements.

---

[265] 11 U.S.C. § 548(a)(1)(B)

[266] As discussed above as to the Trustee's actual fraudulent transfer cause of action under TUFTA, this element is imported to the state law cause of action through § 544(b)(1) of the Bankruptcy Code.

[267] *See* TUFTA §§ 24.005(a)(2), 24.006(a). The test under § 24.005(a)(2)(A)–(B) requires that the debtor either "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." These are essentially identical to the balance sheet and income statement tests for insolvency, respectively. TUFTA § 24.005(a)(2)(A)–(B). Section 24.006(a) requires that "the debtor was insolvent at [the time of the transfer] or the debtor became insolvent as a result of the transfer." *Id.* § 24.006(a).

Reasonably equivalent value is not defined in the Bankruptcy Code. In the Fifth Circuit, in order to satisfy this element, the debtor must have "received value that is substantially comparable to the worth of the transferred property."[268] Reasonably equivalent value is measured from the standpoint of creditors and the proper focus is on the net effect of the transfers on the debtor's estate, and the funds available to unsecured creditors.[269] In *Janvey*, the Texas Supreme Court answered a certified question from the Fifth Circuit as to the definition of reasonably equivalent value under TUFTA. There, the Texas Supreme Court held that reasonably equivalent value, for the purpose of analyzing a good-faith affirmative defense under TUFTA, has three prongs: (1) full performance under a lawful, arm's-length contract for fair market value; (2) providing consideration that had objective value at the time of the transaction; and (3) making the exchange in the ordinary course of the transferee's business.[270]

Here, the Trustee failed to carry his burden to prove that Essential did not receive reasonably equivalent value as to the Transfers as a matter of law. The Trustee failed to affirmatively assert any facts directly supporting his position beyond pointing out the minimal residual cash Essential received from the UMB Escrow. Although the Trustee cited to the existence of the *Janvey* factors, he failed to cite to evidence suggesting their existence in the record. Instead, the Trustee asserts only two facts on reasonably equivalent value: (1) OTAF's expert did not render an opinion in his report as to reasonably equivalent value;[271] and (2) Essential's other creditors had no control over the distribution of the funds from the UMB Escrow.[272] These facts

---

[268] *Stanley v. U.S. Bank Nat'l Assn. (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994)) (internal quotation marks omitted).

[269] *Id.* (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)) (internal citations and quotation marks omitted).

[270] 487 S.W.3d at 564.

[271] ECF No. 104 ¶ 91.

[272] *Id.* ¶ 92.

51

alone do not conclusively establish that Essential did not receive reasonably equivalent value as to the transfers.

The Court addressed the issue of Essential's insolvency in its analysis as to the asserted badges of fraud. In summary, although the Trustee's expert was the only one to express an opinion as to insolvency and opined that Essential was insolvent at the time of the Transfers, the balance sheets Caufield sent to OTAF purport to show solvency at least through April 11, 2018. Although perhaps not sufficient to rebut the Trustee's expert report at trial, taking the balance sheet evidence in the light most favorable to the non-moving party, OTAF, the Court finds that there exists a factual dispute regarding insolvency, the resolution of which requires the Court to weigh evidence and determine credibility.

Because the Trustee failed to carry his burden of proving that Essential did not receive reasonably equivalent value and because there exists a genuine issue of material fact as to Essential's insolvency, the Court must deny the Trustee Motion as to the Trustee's Count Three for avoidance of constructive fraudulent transfers under § 548(a)(1) of the Bankruptcy Code and the Trustee's now-amended Count Four for avoidance of constructive fraudulent transfers under §§ 24.005 and 24.006 of TUFTA.

## C. Count Five – Preferences Under § 547(b)

OTAF seeks summary judgment in its favor on the Trustee's fifth cause of action in which he seeks avoidance of certain of the Transfers as preferences pursuant to § 547(b) of the Bankruptcy Code. The Trustee, though not moving for summary judgment on this particular claim, seeks summary judgment in his favor on three of OTAF's affirmative defenses asserted in connection with this cause of action: (1) the Transfers were contemporaneous exchanges of new value; (2) the Transfers were in the ordinary course of business between Essential and OTAF (the

"**Subjective Prong**") and the Transfers were in the ordinary course of business for businesses in OTAF's industry (the "**Objective Prong**"); and (3) OTAF provided subsequent new value to Essential. The Court finds, for the reasons set forth below, that OTAF is not entitled to summary judgment on the Trustee's fifth cause of action, and that the Trustee is only entitled to summary judgment in his favor as to OTAF's subjective ordinary course of business defense.

Congress enacted § 547 of the Bankruptcy Code in 1978 as part of its major overhaul of bankruptcy laws.[273] In § 547(b), "Congress broadly authorized bankruptcy trustees to avoid any transfer of an interest of the debtor in property *if* five conditions are satisfied and *unless* one of [nine] exceptions . . . is applicable."[274] Thus, in addition to establishing that an interest of the debtor in property was transferred, a bankruptcy trustee must also show that an avoidable preference: (1) benefitted a creditor; (2) was made on account of an antecedent debt; (3) was made while the debtor was insolvent; (4) was made within 90 days before bankruptcy or within one year before bankruptcy if the creditor was an insider at the time of the transfer; and (5) enabled the creditor to receive a larger share of the estate than if the transfer had not been made.[275] In engaging in this endeavor, a trustee must conduct reasonable due diligence into the circumstances of the case and take into account a party's known or reasonably knowable affirmative defenses under subsection (c).[276]

1. *Were the Transfers to OTAF preferential as a matter of law?*

Initially, OTAF contends that it had a perfected, enforceable lien that relates back to the creation of its security interest and, therefore, the payments made to it were not preferential. In

---

[273] *Union Bank v. Wolas*, 502 U.S. 151, 156 (1991).
[274] *Id.* at 154 (quoting 11 U.S.C. § 547(b)) (internal quotation marks omitted) (emphasis in original).
[275] *Id.* at 154–55; *see* 11 U.S.C. § 547(g) ("[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section.").
[276] 11 U.S.C. § 547(b).

support of its argument, OTAF relies on *Grant v. Kaufman, P.A. (In re Hagen)*. In *Hagen*, the Eleventh Circuit was asked to determine whether a payment made to an attorney forty-seven days before bankruptcy was a preference.[277] The attorney in question "claim[ed] a charging lien under a contingent fee contract entered into outside the 90-day preference period, and it [was] acknowledged as a matter of law that the charging lien relat[ed] back to the commencement of the attorney's representation."[278] The court held that the challenged transfer was not a preference because, under Florida common law, an attorney's lien relates back to the commencement of the representation of the client—a date that was well outside the preference period in that case.[279] Florida common law essentially created a fiction in which the attorney's security interest was deemed perfected as of the date the attorney-client relationship was consummated, simultaneously leaving the date on which the client received an interest in the funds transferred unaffected. *Hagen* is entirely distinguishable on its facts.

Here, according to OTAF, it perfected its security interest in the proceeds from the sale of its purported collateral by possession on July 3, 2018. As the Court found above, OTAF's argument collapses from the start because OTAF never perfected its security interest. Even if it had, because OTAF is a non-statutory insider, this date is within the applicable, extended preference period for transfers to insiders.[280] Nevertheless, OTAF argues that its purported perfection relates back to the date of the creation of its security interest at the signing of the 2015 Agreement. OTAF does not cite Texas statutory or common law to support this argument, choosing instead to rely entirely on *Hagen*. Thus, OTAF has failed to present a legal foundation

---

[277] 922 F.2d at 744.
[278] *Id.*
[279] *Id.* at 745.
[280] 11 U.S.C. § 547(b)(4)(B) (extending the preference period to one year before the date of the filing of the petition if the transferee is an insider).

for its argument under Texas law (as opposed to Florida common law), much less overcome the significant factual distinctions between this case and *Hagen*.

Moreover, even if there were Texas law supporting OTAF's "relation-back" argument, it would not change the result in the context of a preference action.  Seven years after the Eleventh Circuit decided *Hagen*, the Supreme Court was asked in *Fidelity Financial Services, Inc. v. Fink* to resolve a Circuit split between, *inter alia*, the Fifth and Eleventh Circuits as to when a transfer is perfected under § 547(c)(3)(B).[281]  The Fifth Circuit had previously held that the perfection period under § 547(c)(3)(B) prevailed over a longer grace period provided by state law,[282] whereas the Eleventh Circuit held the opposite—a transfer is perfected under § 547(c)(3)(B) as of the date the creditor's lien has priority under state law.[283]  Fidelity, the creditor therein, advanced the position that, although it did not perfect its security interest within the period provided in the enabling loan exception, its lien should nevertheless be deemed perfected as of the date of its creation because Fidelity *did* perfect within the period allowed under applicable Missouri law.[284]

The Supreme Court rejected Fidelity's position, explaining that "the terms of § 547(e)(1)(B) apparently imply that a transfer is 'perfected' only when the secured party has done all the acts required to perfect its interest, not at the moment as of which state law may retroactively deem that perfection effective."[285]  It cited several reasons for its conclusion, including that:

> Section 546 of the Code puts certain limits on the avoidance powers set forth elsewhere, as in the provision of § 546(b)(1)(A) that the 'rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.'

---

[281] 522 U.S. at 214.  Section 547(c)(3)(B) contains what is commonly called the "enabling loan exception."  *Id.* at 214.  The enabling loan exception protects from avoidance liens that are "perfected on or before 20 days after the debtor receives possession" of the property acquired with the enabling loan funds.  *Id.* (quoting 11 U.S.C. § 547(c)(3)(B)).

[282] *See Howard Thornton Ford, Inc. v. Fitzpatrick (In re Hamilton)*, 892 F.2d 1230, 1234–35 (5th Cir. 1990).

[283] *See General Motors Acceptance Corp. v. Busenlehner (In re Busenlehner)*, 918 F.2d 928, 930–31 (11th Cir. 1990), cert. denied *sub nom. Moister v. General Motors Acceptance Corp.*, 500 U.S. 949 (1991).

[284] 522 U.S. at 214–15.

[285] *Id.* at 216

> Not only does the series skip from § 545 to § 549, but the omission of § 547 becomes all the more pointed when read against the other subsections of § 546, all of which refer explicitly to powers and proceedings under § 547. See 11 U.S.C. §§ 546(a), (c)-(g). So, it is hard to resist the implication that Congress quite specifically intended a trustee's power to avoid prepetition preferences to prevail over any state rules permitting relation back.[286]

Pursuant to § 547(e), "a transfer of . . . property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee."[287] In this case, even assuming *arguendo* that OTAF had a security interest in all of Essential's assets and that it perfected that security interest by possession of the proceeds thereof, such perfection would have occurred within the insider preference period. Thus, both the alleged perfection of OTAF's security interest and the Transfers made during the insider preference period are not immune from avoidance as a matter of law.

> 2.     *OTAF's Affirmative Defenses to Avoidance of Preferences*

OTAF next argues that, even if the Transfers were preferential, at least three of the nine affirmative defenses specified in § 547(c) apply here: (1) contemporaneous exchange of new value; (2) the Subjective Prong and/or Objective Prong of the ordinary course of business defense; and (3) new value.

> a.     Contemporaneous Exchange of New Value

Perhaps OTAF's strongest defense to the Trustee's claim for avoidance of preferences is that Essential's purchases of online classes through OTAF's "franchise store" were contemporaneous exchanges of new value. A trustee may not avoid a transfer "to the extent that such transfer was intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and in fact a

---

[286] *Id.* at 217. The Court notes that, in the 23 years since *Fink* was decided, Congress added two more subsections to § 546 that limit a bankruptcy trustee's avoidance powers (§§ 546 (h) and (j)), but did not amend § 546(b)(1)(A).
[287] 11 U.S.C. § 547(e)(1)(B).

substantially contemporaneous exchange."[288] Thus, to establish this defense, a creditor must show

intent, contemporaneousness, and new value given.[289] Here, despite the fact that OTAF may have

a formidable argument at trial that the vast majority of the Pre-Escrow Transfers representing

purchases from the "franchise store" were contemporaneous exchanges, it did not meet its legal

and evidentiary burdens for summary judgment purposes.

Initially, to establish a contemporaneous exchange defense, a creditor "must demonstrate

the 'specific measure' of the new value received by the debtor."[290] As the Fifth Circuit explained

in *Southmark*, that demonstration requires a showing that the otherwise preferential transfers

"added tangible value to the bankruptcy estate so as to further the policy underlying this

defense."[291] OTAF has not presented evidence as to the specific measure of new value Essential

received such that the Court could ascertain the tangible value to the bankruptcy estate. The Court

could certainly *speculate* as to a number of ways in which Essential benefitted, such as providing

the classes purchased from the franchise store to Essential's students at a profit, but the Court may

not grant summary judgment based on its own suppositions. It must rely on the record before it

and that record is devoid of any evidence to establish the new value prong of the contemporaneous

exchange defense as a matter of law. For this reason alone, the Court must deny the OTAF Motion.

Yet, even if OTAF had overcome this burden by presenting sufficient evidence of new

value, it faces a plethora of other evidentiary issues. In support of its argument, OTAF relied on

the Declaration of Gene Longobardi (the "**Longobardi Declaration**"),[292] and Exhibits 135 and

136 thereto, which are data and charts prepared by OTAF's accounting staff. OTAF further relied

---

[288] 11 U.S.C. § 547(c)(1).

[289] *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, No. 99-11401, 2000 WL 1741550, at *3 (5th Cir. Nov. 7, 2000).

[290] *Id.* (citing *Creditor's Comm. v. Spada (In re Spada)*, 903 F.2d 971, 976–77; *Jet Fla. Sys., Inc. v. Am. Airlines, Inc. (In re Jet Fla. Sys.)*, 861 F.2d 1555, 1558 (11th Cir. 1988)).

[291] *Id.*

[292] OTAF App. at 4–9 (body); 10–265 (exhibits to the Longobardi Declaration).

on a declaration and expert report prepared by Don Fife (together, the "**Fife Report**").[293] Preliminarily, the charts OTAF's accounting staff prepared are hearsay.[294] Although the Trustee did not specifically raise a hearsay objection to them, he has certainly challenged their reliability and Longobardi's personal knowledge as to their accuracy.[295] Moreover, although the Court may consider hearsay to which an objection is not made, it is not required to do so.[296]

Given that the Trustee has raised significant concerns regarding the charts' reliability, the Court is not inclined to consider them unless there is an applicable hearsay exception. One possible exception is the business-records exception.[297] To establish the requisite foundation for the business-records exception, the proponent must provide an affidavit, establishing that the affiant has: 1) personal knowledge to testify as custodian of documents; and 2) personal knowledge as to some of the statements in the affidavit.[298] Mr. Longobardi does claim that he has knowledge of at least some of the statements in the Longobardi Declaration, arguably satisfying the second prong of the business records exception. However, the Longobardi Declaration lacks foundation because it does not state that Mr. Longobardi was the custodian of the relevant business records or otherwise represent that records are kept under his custody or control.

Additionally, the relevant statements contained in the Longobardi Declaration are themselves inadmissible as they are not based upon personal knowledge. In paragraph 14 of the Longobardi Declaration, he states:

---

[293] *Id.* at 266–399.

[294] *See Bonn Operating Company v. Devon Energy Production Company, LP*, Civil Action 4:06-CV-734-Y, 2009 WL 10677308, at *1 (N.D. Tex. Sept. 24, 2009) (collecting cases).

[295] *See, e.g.*, ECF No. 71 at 3–4; 7–8.

[296] *Bellard v. Gautreax*, 675 F.3d 454, 461 (5th Cir. 2012) (also noting that the Fifth Circuit can correct the admission of unobjected to hearsay in the interest of fairness).

[297] *See Bonn*, 2009 WL 10677308, at *1 ("[S]uch documents may be admitted over a hearsay objection to prove their contents where the proponent of the evidence has established the foundation for the business-records exception set out in Fed. R. Evid. 803(6)."); Fed. R. Evid. 803(6) (the "business-records" exception).

[298] *Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

> The accounting information that constituted the basis of Mr. Fife's expert witness report was prepared by the accounting staff of OTAF from business records maintained by OTAF in the regular course of its business. The business and accounting records of OTAF sent to Mr. Fife are kept on a substantially contemporaneous basis and, while the reports were created for this litigation, *I have no reason to believe* that they are inaccurate."[299]

According to the Fifth Circuit, statements in affidavits must be based on personal knowledge, not based merely on information and belief.[300]  This statement from the Longobardi Declaration shows that he lacked personal knowledge as to the accuracy of the business and accounting records that were sent to Mr. Fife.

The statement also does not satisfy the requirements of Rule 602 of the Federal Rule of Evidence. In *Bonn Operating Company v. Devon Energy Production Company*, Judge Means, dealing with a similar issue, held that statements contained in an affidavit were insufficient for the purposes of Rule 602, where the affiant's only knowledge of certain billing statements came from reviewing them.[301]  There was no evidence that the affiant prepared the billing statements, took part in the accounting underlying the billing statements, or had any knowledge of the amounts allegedly owed independent of those billing statements, which were excluded as hearsay.[302]  Here, not only is there no evidence of these items, the Longobardi Declaration provides at least some evidence that Longobardi did not prepare the summaries, nor did he take part in the accounting underlying them.

Furthermore, as was the case in *Bonn*, the "best-evidence" rule precludes OTAF from relying on the summaries of invoices and payments, where the originals are available.  Rule 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its

---

[299] OTAF App. at 7, ¶ 14 (emphasis added).
[300] *Obregon v. U.S.*, 791 Fed. App'x 458, 461 (5th Cir. 2019) (quoting *Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003)).
[301] *Bonn*, 2009 WL 10677308 at *5.
[302] *Id.*

content unless these rules or a federal statute provides otherwise."[303]  OTAF has not cited to any rule or federal statute that provides otherwise, or circumstances that would justify the use of the summaries over the original invoices and payments.  Instead, OTAF is impermissibly using the charts to "testify" as to the content of the originals. The testimony of OTAF's expert, Don Fife, confirms that, at the very least, invoices do in fact exist.[304]

The Fife Report does nothing to cure this deficiency.  Fife was not involved in the preparation of the charts and did not make a reasonable effort to verify their accuracy.  Fife's deposition testimony shows that he does not know how OTAF applied payments to invoices[305] and that he only tested about 10 of the invoices.[306]  OTAF cannot turn water into wine by attaching documents, which themselves are hearsay, to an expert report, which is also hearsay.  Further, the Expert Report itself is not helpful as to OTAF's contemporaneous exchange defense because Fife neither conducted that analysis, nor did he opine on it.[307]  Nor can OTAF correct the oversight by attaching a "re-sorted" exhibit, presumably prepared for its contemporaneous exchange defense, accompanied by a declaration of OTAF's counsel (the "**Yaspan Declaration**")—not Mr. Fife.[308]

Thus, because OTAF failed to present evidence of the specific measure of new value it provided to Essential in the asserted contemporaneous exchanges, and for the myriad evidentiary issues detailed above, the Court must deny summary judgment in OTAF's favor on its contemporaneous exchange affirmative defense.

b.    Ordinary Course of Business Defenses as to the Escrow Transfer

---

[303] Fed. R. Evid. 1002.
[304] Trustee Obj. App. at 045, 19:9-14.
[305] Trustee Obj. App. at 044–45, 18:25, 19:1-4.
[306] *Id.* at 045, 19:9-19.
[307] *See generally* OTAF App. 271–79.  Fife only evaluated OTAF's "net new value" defense under § 547(c)(4), and its ordinary course of business defense.  *Id.* at 272 (summarizing the "Expert Opinions" in the Fife Report).
[308] OTAF App. at 402–03; 474–502.

Next, OTAF seeks summary judgment in its favor on the Subjective Prong of the ordinary course of business defense under § 547(c)(2)(A) of the Bankruptcy Code. The Trustee, conversely, seeks summary judgment in his favor on the same. The Trustee alone also seeks summary judgment in his favor on the Objective Prong of the ordinary course of business defense under § 547(c)(2)(B) of the Bankruptcy Code.

The Objective Prong concerns whether the challenged payments are consistent with the "customary terms and conditions" other parties in the same industry facing the same or similar problems use.[309] Ordinary business terms refer to the range of terms that encompasses the practices in which firms similar to the creditor engage.[310] "[O]nly dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope."[311] The Trustee has not presented evidence as to the practices in OTAF's and Essential's industry, and likewise has not proven that OTAF *cannot* produce, rather than simply has not produced, similar evidence. Thus, the Court is left without appropriate summary judgment evidence with which to evaluate the Objective Prong, and therefore must deny the Trustee Motion insofar as it seeks summary judgment thereon.

Conversely, the Subjective Prong focuses on whether the transactions between the debtor and the creditor both before and during the preference period are consistent.[312] The defense is narrow, and typically requires consideration of four elements: (1) the length of time the parties were engaged in transactions prior to the preference period; (2) whether the amount or form of tender differed from past practices; (3) whether the creditor engaged in any unusual collection or

---

[309] *Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Nat. Gas Corp. (In re Gasmark, Ltd.)*, 158 F.3d 312, 317 (5th Cir. 1998); *see Ramba*, 437 F.3d at 462.
[310] *In re KLN Steel Products Co., LLC*, 506 B.R. 461, 469 (Bankr. W.D. Tex. 2014) (quoting *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 368 (5th Cir.2002)).
[311] *Id.*
[312] *Id.*; *Lightfoot v. Amelia Maritime Svcs. Inc. (In re Sea Bridge Marine, Inc.)*, 412 B.R. 868, 872 (Bankr. E.D. La. 2008).

payment activities prior to the transfers; and (4) the circumstances under which the transfers were made.[313]

Three of these four elements militate heavily toward the Escrow Transfer being well outside the scope of the ordinary course of business between Essential and OTAF. To be certain, the sale of an entity's assets and distribution of the proceeds to a creditor is the quintessential extraordinary transaction. The amount of the Escrow Transfer, more than $850,000.00, is the single largest payment between Essential and OTAF by several orders of magnitude. The method by which the Escrow Transfer was made to OTAF, via the UMB Escrow, was also a unique occurrence in the course of dealing between OTAF and Essential. Furthermore, Essential had never sold, or been required by OTAF to sell, assets to make any payment, past due or otherwise. As has been established, OTAF exercised almost unilateral control over the Asset Sale process, the UMB Escrow, and the payments to be made therefrom. Finally, the circumstances under which the Escrow Transfer was made—essentially a fire-sale of Essential's assets in the face of an SEC investigation into Caufield—were unique in the course of dealing between Essential and OTAF.

OTAF has not produced any evidence or articulated any argument to rebut these findings. The Court finds, based on the undisputed evidence before it, that there is no set of facts in this case under which a reasonable factfinder could rule that the Escrow Transfer was in the subjective ordinary course of business between Essential and OTAF. Thus, the Court grants the Trustee Motion and denies the OTAF Motion as to the Subjective Prong.

      c.    <u>Ordinary Course Defense as to the Pre-Escrow Transfers</u>

The Court finds that the same evidentiary issues as discussed above in relation to the contemporaneous exchange defense foreclose OTAF's ordinary course defense as to the Pre-

---

[313] *Lightfoot*, 412 B.R. at 872.

Escrow Transfers. OTAF simply has not produced evidence sufficient to show that it is entitled to summary judgment as to each of the Pre-Escrow Transfers on ordinary course grounds. As such, the OTAF Motion must be denied in this regard.

The Court likewise, however, must deny the Trustee Motion insofar as it seeks summary judgment in the Trustee's favor on this defense. The Trustee's argument is primarily an attack on the credibility of Fife and the Fife Report. This attack is not, as detailed above, without merit, as it appears that Fife performed a Frankensteinian combination of the Subjective Prong and Objective Prong analyses to reach his conclusion. Even so, the Trustee did not present any meaningful evidence of his own showing that he is entitled to summary judgment on this defense. Instead, the Trustee focuses on what he refers to as "unusual" collection activity after OTAF issued the Notices of Incurable Default, without providing evidence that the alleged unusual collection activity was outside the ordinary course of business as between the parties. Thus, the Court must also deny the Trustee Motion as to the ordinary course defense applied to the Pre-Escrow Transfers.

        d.    <u>Subsequent New Value</u>

Finally, OTAF and the Trustee both seek summary judgment in their favor on OTAF's subsequent new value defense to the Trustee's preference claim pursuant to § 547(c)(4) of the Bankruptcy Code. The Trustee specifically seeks to bifurcate the defense as it relates to the Pre-Escrow Transfers and the Escrow Transfer. For the reasons that follow, the Court believes that such bifurcation is appropriate in these circumstances, and will grant summary judgment in the Trustee's favor, and conversely deny summary judgment in OTAF's favor, on the subsequent new value defense regarding the Escrow Transfer. The Court will deny summary judgment in favor of either party on the subsequent new value defense regarding the Pre-Escrow Transfers.

Here again, OTAF is faced with the same evidentiary issues discussed in detail above related to the Longobardi Declaration, Fife Report, and Yaspan Declaration. Even if the Court could look past these issues, the OTAF Motion must be denied because the Court cannot parse exactly the thrust of what OTAF is attempting to argue. The portion of the OTAF Brief related to subsequent new value fails to follow, or even allude to, any accepted method of analyzing subsequent new value that the Court can discern. OTAF was given a second bite at the apple in the OTAF Response to the Trustee Motion and Brief, but failed to elaborate on its position. This failure is particularly perplexing considering the primary focus of the Fife Report was subsequent new value.

The Trustee's argument as to the Pre-Escrow Transfers presumes that they were actually or constructively fraudulent and that, therefore, the subsequent new value defense does not apply.[314] As discussed above, however, the Court has not found, at this stage, that the Pre-Escrow Transfers were actually or constructively fraudulent. Thus, the Court must deny the Trustee Motion as to the Pre-Escrow Transfers, as the Trustee did not present an additional or alternative argument.

As to the Escrow Transfer, however, the Trustee argues that the subsequent new value defense does not apply because OTAF did not provide value to Essential after the Escrow Transfer. Section 547(c)(4) provides that the subsequent new value defense requires that a creditor provide new value for the benefit of the debtor *after* the challenged transfer was made.[315] Here, the undisputed facts show, and the Fife Report concedes, that OTAF did not provide new value for the benefit of Essential *after* the Escrow Transfer was made. The Escrow Transfer was the last transfer

---

[314] *See* 11 U.S.C. § 547(c) (limiting the applicability of the defenses thereunder to transfers challenged under § 547 only).
[315] *Id.* § 547(c)(4); *Laker v. Vallette (In re Toyota of Jefferson)*, 14 F.3d 1088, 1092 (5th Cir. 1994).

between the parties. As such, the Court finds that the Trustee is entitled to summary judgment in his favor on OTAF's subsequent new value defense as it relates to the Escrow Transfer.

## D.  OTAF's Affirmative Defenses

Finally, the Trustee seeks summary judgment in his favor on many of the affirmative defenses OTAF asserted in its Answer, namely: (1) right of setoff; (2) recovery does not benefit unsecured creditors; (3) statute of limitations; (4) equitable defenses; and (5) future extensions of credit.

The Court will grant summary judgment in the Trustee's favor as to the future extensions of credit defense because OTAF withdrew it in the OTAF Response. The Court will also grant summary judgment in the Trustee's favor as to the right of setoff defense. OTAF cites to the very case that forecloses it from asserting this defense. In *In re McConnell*, the Fifth Circuit held that "Section 553(a) setoffs . . . do not apply to actions by the Trustee to recover fraudulent transfers."[316] The logic of *McConnell* applies with even greater force as to preference actions.[317]

The Court will also grant summary judgment in the Trustee's favor as to OTAF's fourteenth affirmative defense, that recovery does not benefit the unsecured creditors. As the Trustee correctly noted, this is simply not a legally cognizable defense. Moreover, if OTAF has some sort of indemnity claim, § 502(e)(2) of the Bankruptcy Code permits OTAF to make that claim once liability has been established. Section 502(h) permits similar relief regarding a claim arising out of the recovery of property under § 550.

Finally, the Court will deny the Trustee's request for summary judgment as to OTAF's statute of limitations defense and equitable defenses. Although the Court doubts OTAF's ability

---

[316] 934 F.2d 662, 667 (5th Cir. 1991).
[317] Because OTAF did not include the right of recoupment as an affirmative defense in its Answer, the Court will not address it here.

to succeed on these defenses at trial, the Trustee failed to carry his evidentiary burden and did not cite any case law demonstrating that OTAF cannot succeed on these defenses as a matter of law.

Based upon the foregoing, and for those additional reasons stated on the record in the Court's oral bench ruling:

**IT IS HEREBY ORDERED** that the Trustee Motion is **GRANTED IN PART** and **DENIED IN PART** as provided herein; and it is further

**ORDERED** that the OTAF Motion is **DENIED.**

**###END OF ORDER###**
